James MONROE, Jr., James Monroe, Sr., and Shana Monroe, Appellants,

v.

ALTERNATIVES IN MOTION, Corey Williams, and Angela Williams, Appellees.

Nos. 01–05–01187–CV, 01–05–01188–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 22, 2007.

Shawn Casey, Shawn Casey & Associates, Sybil Jane Carr, Houston, TX, for Appellants.

Lester R. Buzbee, III, Humble, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices JENNINGS and BLAND.

## OPINION

JANE BLAND Justice.

Appellant James Monroe, Jr. ("James Jr."), together with James Monroe, Sr. ("James Sr.") and Shana Monroe (James Sr. and Shana will be known collectively as the "Monroes") appeal the trial court's order terminating the parental rights of James Jr., and appointing appellee Alternatives in Motion ("AIM") as the sole managing conservator of J.A.M.J., a minor child.[1] In three issues, James Jr. and the Monroes contend (1) the trial court erred in failing to appoint the Monroes as joint managing conservators of J.A.M.J. in accordance with James Jr.'s designation in his affidavit of voluntary relinquishment of parental rights, (2) the trial court abused its discretion in not granting conservatorship rights to the Monroes, and (3) the trial court abused its discretion in denying the request for a trial by jury. We conclude that (1) the evidence is legally sufficient to support the trial court's presumed finding that James Jr.'s affidavit of relinquishment was voluntarily executed, (2) the trial court did not abuse its discretion in denying conservatorship rights to the Monroes, and (3) the trial court did not abuse its discretion in denying the request for a trial by jury. We therefore affirm.

## Background

Jaculynn Rochelle Jackson and James Jr. are the biological parents of J.A.M.J. While Jaculynn was pregnant with J.A.M.J., she decided to present her for adoption. Jaculynn contacted AIM, an adoption agency, and executed an affidavit of status naming James Jr. as the father of J.A.M.J. Ronald Landry, an employee of AIM, attempted to contact James Jr. on several occasions but the Monroes—James Jr.'s parents and the paternal grandparents of J.A.M.J.—refused to allow James Jr. to speak with Landry because James Jr. was only seventeen at the time. AIM filed this lawsuit in September 2003, seeking to terminate the parent-child relationships between Jaculynn, James Jr., and J.A.M.J., and to have AIM appointed sole managing conservator of J.A.M.J.

J.A.M.J. was born on November 24, 2003. Shortly thereafter, Jaculynn executed an affidavit of voluntary relinquishment of parental rights, designating AIM as managing conservator of J.A.M.J. On November 26, 2003, AIM placed J.A.M.J. with appellees Corey and Angela Williams (the "Williams"), the prospective adoptive parents chosen by Jaculynn and pre-approved by AIM. The Williams live in North Dakota.

After J.A.M.J. was born, the trial court issued sanctions to force James Jr. to submit to a paternity test. DNA testing confirmed James Jr.'s paternity in December 2004. In June 2005, the Monroes intervened in this lawsuit, seeking to be appointed joint managing conservators of J.A.M.J. The Williams intervened in this suit as well, seeking to adopt J.A.M.J. In October 2005, James Jr. executed an affidavit of voluntary relinquishment of parental rights, naming the Monroes as managing conservators and prospective adoptive parents. The trial court held a bench trial in November 2005. At the conclusion of the trial, the court terminated the parental rights of both Jaculynn and James Jr., and

---

1. James Jr. and the Monroes also appealed the trial court's adoption order in cause number 01–05–01188–CV. We previously dismissed cause number 01–05–01188–CV for want of prosecution, but later granted the Monroes' motion for rehearing, and held that the brief in cause number 01–05–01187–CV shall serve as the brief in cause number 01–05–01188–CV. The brief in cause number 01–05–01187–CV, however, does not challenge the trial court's adoption order.

appointed AIM as the sole managing conservator of J.A.M.J.

### Relinquishment of Parental Rights

■ In their first issue, James Jr. and the Monroes contend that the trial court erred in failing to appoint the Monroes as joint managing conservators of J.A.M.J. in accordance with James Jr.'s managing conservator designation in his affidavit of voluntary relinquishment of parental rights. Specifically, James Jr. and the Monroes contend that James Jr. was fraudulently induced to execute the affidavit because the trial court did not comply with James Jr.'s managing conservator designation. AIM and the Williams respond that a designation of a managing conservator in an affidavit of voluntary relinquishment of parental rights does not bind a trial court, and the best interest of the child is determinative with regard to the appointment of conservators.

■ The Texas Supreme Court has held that the natural right between parents and their children is one of constitutional dimensions. *See Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985); *In re G.M.,* 596 S.W.2d 846, 846 (Tex.1980); *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976). Therefore, termination proceedings must be strictly scrutinized in favor of the parent. *In re V.R.W.,* 41 S.W.3d 183, 190 (Tex.App.-Houston [14th Dist.] 2001, no pet.), *overruled on other grounds, In re J.F.C.,* 96 S.W.3d 256, 267 n. 39 (Tex.2002); *see also G.M.,* 596 S.W.2d at 846; *Cawley v. Allums,* 518 S.W.2d 790, 792 (Tex.1975).

Family Code section 161.001 authorizes a trial court to terminate a parent-child relationship if the court finds by clear and convincing evidence that the parent has executed an unrevoked affidavit of relinquishment of parental rights, and termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001(1)(K), (2)

(Vernon Supp.2006). A parent may designate a competent person, authorized agency, or licensed child-placing agency to serve as managing conservator of the child in an unrevoked or irrevocable affidavit of relinquishment of parental rights. *Id.* § 153.374(a) (Vernon 2002). "The person or agency designated to serve as managing conservator shall be appointed managing conservator unless the court finds that the appointment would not be in the best interest of the child." *Id.* § 153.374(b); *In re D.R.L.M.,* 84 S.W.3d 281, 300 (Tex.App.-Fort Worth 2002, pet. denied) (holding that trial court is not obligated to comply with appointment of managing conservator in affidavit of voluntary relinquishment of parental rights if trial court finds that appointment would not be in best interest of child), *superseded by statute on other grounds,* TEX. FAM.CODE ANN. § 263.405(i) (Vernon Supp.2006). "Section 153.374 clearly provides that in appointing a managing conservator in such cases, the trial court need not comply with the parent's designation of a managing conservator if the designation is not in the [child's] best interest." *Dep't of Family & Protective Servs. v. Alternatives in Motion,* 210 S.W.3d 794, 803 (Tex.App.-Houston [1st Dist.] 2006, pet. filed). "A direct or collateral attack on an order terminating parental rights based on an unrevoked affidavit of relinquishment of parental rights or affidavit of waiver of interest in a child is limited to issues relating to fraud, duress, or coercion in the execution of the affidavit." TEX. FAM.CODE ANN. § 161.211 (Vernon 2002).

■ Implicit in the Family Code is the requirement that an affidavit of relinquishment of parental rights must be voluntarily executed. *Williams v. Williams,* 150 S.W.3d 436, 447 (Tex.App.-Austin 2004, pet. denied); *V.R.W.,* 41 S.W.3d at 192; *Vela v. Marywood,* 17 S.W.3d 750, 759

(Tex.App.-Austin 2000, pet. denied); *Neal v. Tex. Dep' t of Human Servs.*, 814 S.W.2d 216, 218–19 (Tex.App.-San Antonio 1991, writ denied). Moreover, because an affidavit of relinquishment waives a constitutional right, it must be made voluntarily, knowingly, intelligently, and with full awareness of its legal consequences. *V.R.W.*, 41 S.W.3d at 192; *Vela*, 17 S.W.3d at 759. The proponent of the affidavit has the burden to establish by clear and convincing evidence that the affidavit was executed according to the terms of section 161.103 of the Family Code. TEX. FAM. CODE ANN. § 161.103 (Vernon Supp.2006); *V.R.W.*, 41 S.W.3d at 192–93; *Vela*, 17 S.W.3d at 758. An affidavit of relinquishment in proper form is prima facie evidence of its validity. *V.R.W.*, 41 S.W.3d at 190. Once the proponent has met that burden, the burden then shifts to the affiant to establish by a preponderance of the evidence that the affidavit was executed as a result of fraud, duress, or coercion. *Id.* at 193; *Vela*, 17 S.W.3d at 758; *see also* TEX. FAM.CODE ANN. § 161.211(c). An involuntarily executed affidavit is a complete defense to a termination decree. *V.R.W.*, 41 S.W.3d at 193; *Vela*, 17 S.W.3d at 759; *Neal*, 814 S.W.2d at 219.

Because James Jr. and the Monroes had the burden at trial to establish by a preponderance of the evidence that James Jr. did not voluntarily execute the affidavit of relinquishment, they must demonstrate on appeal that the evidence conclusively established all vital facts in support of their claim. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). After the termination trial, the trial court issued findings of fact and conclusions of law in which it stated, "The Court finds from clear and convincing evidence that JAMES MONROE, JR. signed a relinquishment of parental rights to JAMES MONROE, SR. and SHANA MONROE." In making this finding, the trial court necessarily determined that James Jr.'s affidavit was voluntarily executed. *See D.R.L.M.*, 84 S.W.3d at 297. We therefore interpret James Jr. and the Monroes' appellate attack on the affidavit as a challenge to the legal sufficiency of the evidence to support the trial court's presumed voluntariness finding. *See* TEX.R. CIV. P. 299 (omitted elements are presumed in support of judgment); *D.R.L.M.*, 84 S.W.3d at 297–98.

■ In a legal sufficiency challenge by a party with the burden of proof at trial, we examine the entire record to determine if the proposition contrary to the finding is established as a matter of law. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Sterner*, 767 S.W.2d at 690. Only if the contrary proposition is established as a matter of law will we sustain the issue. *See City of Keller*, 168 S.W.3d at 827; *Sterner*, 767 S.W.2d at 690.

■ In determining whether fraud existed in the execution of an affidavit of relinquishment of parental rights so as to render the affidavit involuntary, courts look to the circumstances surrounding its execution. *D.R.L.M.*, 84 S.W.3d at 296–97; *Vela*, 17 S.W.3d at 762. For example, in *Queen v. Goeddertz*, the court held that an affidavit of relinquishment was involuntary when it contained a paragraph stating the father relinquished his rights "subject to the understanding that I will have reasonable visitation rights with my child." 48 S.W.3d 928, 929, 932 (Tex.App.-Beaumont 2001, no pet.). In *Vela v. Marywood*, the court held that an affidavit of relinquishment was involuntary when the evidence conclusively established that the mother wanted to proceed with the adoption only if she could have post-adoption visits with her child. 17 S.W.3d at 762–63. The *Vela* court noted that although the mother testified that she was not threatened, coerced, or defrauded into physically signing the

63

affidavit of relinquishment, nonetheless, she did not know the post-adoption plan she initiated with the adoption agency and the adoptive family was legally unenforceable. *Id.* at 763–64.

In contrast, the court in *D.R.L.M.* held that an affidavit of relinquishment was voluntary when the affidavit was properly executed, the affidavit acknowledged that once parental rights are terminated, the former parent no longer has any say concerning the child, and the appellant admitted that the judge's decision would ultimately determine the fate of her child—despite the parent's complaint that the affidavit was involuntary because the trial court did not comply with the designation of managing conservator contained in the affidavit. 84 S.W.3d at 298–99. Similarly, in *V.R.W.*, the court held that an affidavit of relinquishment was voluntary when there was evidence that the appellant understood that by signing the affidavit of relinquishment, she was giving the child up for adoption and forfeiting her rights to the child. 41 S.W.3d at 193.

The only evidence introduced at trial regarding the voluntariness of James Jr.'s affidavit of voluntary relinquishment of parental rights was the affidavit itself. James Jr. did not testify. The affidavit states, "I freely and voluntarily relinquish to my parents, JAMES MONROE, Sr. and SHANA MONROE all my parental rights and duties," and "I understand that ... once the Court terminates my parental rights, I have no further say concerning my child, whether or not my child is adopted then or at some later time." The affidavit also states, "I designate my parents, JAMES MONROE, Sr. and SHANA MONROE, a prospective adoptive parent [sic], and as managing conservator [sic] of the child." The affidavit further states, "I declare that I fully understand the meaning of this affidavit of relinquishment and

the finality of my action in signing it, and I am signing it freely, voluntarily, and with the firm conviction that this decision is the best available alternative for my child." Moreover, the affidavit acknowledges,

I fully understand that the termination suit may or may not be combined with a suit to adopt my child. I understand that, either way, once the Court terminates my parental rights, I have no further say concerning my child, whether or not my child is adopted then or at some later time.

The affidavit was executed in the proper form. *See* TEX. FAM.CODE ANN. § 161.103; *V.R.W.*, 41 S.W.3d at 190 ("An affidavit of relinquishment in proper form is *prima facie* evidence of its validity."). The social worker who performed a social study on the Monroes in December of 2004 stated in her report that she explained to James Jr. and the Monroes that the court has the final decision with regard to the placement of J.A.M.J. James Jr. was also represented by counsel at the time he executed his affidavit.

James Jr. and the Monroes filed a motion for new trial, but the record contains no indication that the court held an evidentiary hearing on the motion. Additionally, James Jr. and the Monroes did not support the motion with affidavits or other evidence. The record also contains no evidence that James Jr. believed he was executing his affidavit of relinquishment on the express condition that the court appoint the Monroes as managing conservators of J.A.M.J.

We follow those authorities that hold that a designation of a managing conservator in a relinquishment affidavit does not, standing alone, conclusively establish a lack of voluntariness where the parent is informed that he has "no further say concerning the child." *See D.R.L.M.*, 84 S.W.3d at 297–99; *V.R.W.*, 41 S.W.3d at

193. We hold that James Jr. and the Monroes have not conclusively established that James Jr. involuntarily executed his affidavit of relinquishment of parental rights so as to overcome the trial court's finding. *See D.R.L.M.*, 84 S.W.3d at 297–99 (holding evidence was sufficient to support presumed finding that affidavit of relinquishment was voluntary); *V.R.W.*, 41 S.W.3d at 193 (same); *In re Bruno*, 974 S.W.2d 401, 405–06 (Tex.App.-San Antonio 1998, no pet.) (same). We therefore conclude the evidence is legally sufficient to support the trial court's presumed finding that James Jr. voluntarily executed his affidavit of relinquishment of parental rights.

### Managing Conservator

In their second issue, James Jr. and the Monroes contend that the trial court abused its discretion in denying conservatorship rights to the Monroes. Specifically, James Jr. and the Monroes contend that the evidence is legally and factually insufficient to support a finding that granting managing conservatorship rights to the Monroes would not be in the best interest of J.A.M.J. In the trial court's findings of fact, the court states that the appointment of AIM as sole managing conservator is in the best interest of J.A.M.J. In making this finding, the trial court necessarily determined that appointment of the Monroes as managing conservators was not in the best interest of J.A.M.J. *See* TEX. FAM. CODE ANN. § 153.374(b) ("The person or agency designated to serve as managing conservator shall be appointed managing conservator unless the court finds that the appointment would not be in the best interest of the child."); *D.R.L.M.*, 84 S.W.3d at 297. According to Texas Rule of Civil Procedure 299, we presume the trial court found that appointment of the Monroes as managing conservators was not in the best interest of J.A.M.J. *See* TEX.R. CIV. P. 299 (omitted elements are presumed in support of judgment).

Family Code section 161.001 authorizes a trial court to terminate a parent-child relationship if the court finds by clear and convincing evidence that the parent has executed an unrevoked affidavit of relinquishment of parental rights and that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001(1)(K), (2).

> If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Protective and Regulatory Services, a licensed child-placing agency, or an authorized agency as managing conservator of the child. An agency designated managing conservator in an unrevoked or irrevocable affidavit of relinquishment shall be appointed managing conservator.

*Id.* § 161.207(a) (Vernon 2002). A parent may designate a competent person, authorized agency, or licensed child-placing agency to serve as managing conservator of a child in an unrevoked or irrevocable affidavit of relinquishment of parental rights. *Id.* § 153.374(a). "The person or agency designated to serve as managing conservator shall be appointed managing conservator unless the court finds that the appointment would not be in the best interest of the child." *Id.* § 153.374(b).

We review a trial court's decision on custody, control, conservatorship, possession, and visitation matters for abuse of discretion, and reverse the trial court's order only if we determine, from reviewing the record as a whole, that the trial court abused its discretion. *Turner v. Turner*, 47 S.W.3d 761, 763 (Tex.App.-Houston [1st Dist.] 2001, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without ref-

erence to any guiding rules or principles. *Id.* We view the evidence in the light most favorable to the trial court's decision and indulge every legal presumption in favor of its judgment. *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex.App.-Houston [1st Dist.] 1993, writ denied). An allegation of legal or factual insufficiency is not treated as an independent ground of error in this context because the appropriate standard of review is abuse of discretion. *In re D.S.*, 76 S.W.3d 512, 516 (Tex.App.-Houston [14th Dist.] 2002, no pet.). Sufficiency challenges are incorporated into an abuse of discretion determination. *McGuire v. McGuire*, 4 S.W.3d 382, 387 n. 2 (Tex.App.-Houston [1st Dist.] 1999, no pet.).

In determining conservatorship and possession issues, the best interest of the child is always the primary consideration. TEX. FAM.CODE ANN. § 153.002 (Vernon 2002); *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex.2002). Furthermore, public policy of this State is to (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child, (2) provide a safe, stable, and nonviolent environment for the child, and (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage. TEX. FAM. CODE ANN. § 153.001(a) (Vernon 2002). The burden of proof in conservatorship cases is a preponderance of the evidence. *Id.* § 105.005 (Vernon 2002); *In re W.M.*, 172 S.W.3d 718, 724 (Tex.App.-Fort Worth 2005, no pet.) ("The burden of proof in conservatorship cases, as opposed to termination cases, is a preponderance of the evidence."); *Taylor v. Tex. Dep't of Protective Regulatory Servs.*, 160 S.W.3d 641, 653 (Tex.App.-Austin 2005, pet. denied).

*Legal and Factual Sufficiency*

 In an appeal from a bench trial, findings of fact have the same weight as a jury's verdict. *Amador v. Berrospe*, 961 S.W.2d 205, 207 (Tex.App.Houston [1st Dist.] 1996, writ denied). When challenged, findings of fact are not conclusive if, as here, there is a complete reporter's record. *Id.* When there is a reporter's record, the trial court's findings are binding only if supported by the evidence. *Id.* If the findings are challenged, we review the sufficiency of the evidence supporting the findings by applying the same standards that we use in reviewing the legal or factual sufficiency of the evidence supporting jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994).

 The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. In making this determination, we credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* at 822. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. Although we consider the evidence in the light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

 In reviewing a factual sufficiency point, we consider all the evidence supporting and contradicting the finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). We set aside the verdict only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.

1986). In a bench trial, the trial court, as fact-finder, is the sole judge of the credibility of the witnesses. *Sw. Bell Media, Inc. v. Lyles,* 825 S.W.2d 488, 493 (Tex.App.-Houston [1st Dist.] 1992, writ denied).

*Analysis*

Courts have generally considered nine non-exclusive factors set out in *Holley v. Adams* in determining the best interest of the child. 544 S.W.2d 367, 371–72 (Tex.1976). Those factors are (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent, which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* at 372.

The court must also consider the list of factors from Family Code section 263.307.[2] TEX. FAM.CODE ANN. § 263.307(b) (Vernon 2002); *Alternatives in Motion,* 210 S.W.3d at 804. Family Code section 263.307 also states that, "[i]n considering the factors established by this section, the prompt and permanent placement of the child in a safe environment is presumed to be in the

---

**2.** Family Code section 263.307(b) provides:

(b) The following factors should be considered by the court, the department, and other authorized agencies in determining whether the child's parents are willing and able to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM.CODE ANN. § 263.307(b) (Vernon 2002).

child's best interest." Tex. Fam.Code Ann. § 263.307(a).

Considering the pertinent factors from *Holley* and section 263.307, we conclude the evidence in this case is legally and factually sufficient to support the trial court's presumed finding that appointment of the Monroes as managing conservators would not be in the best interest of J.A.M.J. J.A.M.J. was two years old at the time of the termination trial. She had lived her entire life with the Williams family in North Dakota and had never met anyone in the Monroe family. AIM pre-approved the Williams as prospective adoptive parents and Jaculynn chose them to raise the child. All the reports that AIM received regarding J.A.M.J. stated that she was in good health and progressing normally. Landry testified that J.A.M.J. had bonded with the Williams family and that a strong family unit is important to a very young child. He also testified that it would be traumatic and detrimental to move J.A.M.J. away from the Williams at this point in her life.

The Monroes told Landry shortly after he first contacted them that they did not want J.A.M.J. to be adopted. The Monroes, however, made no further attempts to contact AIM in an effort to adopt, support, or make contact with J.A.M.J., even after she was born. Landry testified that it would not be in the best interest of J.A.M.J. to name the Monroes as managing conservators, and that it would instead be in J.A.M.J.'s best interest to name AIM as managing conservator.

Shana testified that terminating the parental rights of James Jr. would not be in the best interest of J.A.M.J. unless the court appointed her and her husband as managing conservators. Shana admitted that she and her husband had not provided any necessaries for J.A.M.J., but it was because they were unable to contact the Williams. Shana testified that she and her husband should be named managing conservators of J.A.M.J. because she believes that it is "very important that [J.A.M.J.] be with her kin people." James Sr. testified that at the time of trial, his family had procured health insurance. He also testified that appointment of himself and his wife as managing conservators would be in J.A.M.J.'s best interest. At the time of the termination trial, James Jr. was in jail awaiting trial on aggravated robbery and aggravated assault charges. Shana testified that James Jr. would not live with her and her husband when he gets out of jail.

A social worker completed a social study of the Monroe family in December 2004. In the study, James Jr. told the social worker that he planned to move back in with his parents when he was released from jail. He also stated that his parents never abused or neglected him as a child. The Monroes have another son named Courtney who is unemployed and lives with his grandmother. Courtney told the social worker that he could not visit his brother in jail because there were several outstanding warrants for his arrest. The Monroes also have a daughter named TaShana who was once on probation for misdemeanor assault. TaShana, however, is a good student and plans to attend college. Courtney and TaShana also spoke of their parents in positive terms and told the social worker their parents had always been fair with regard to discipline. Courtney, James Jr., and TaShana were usually punished for bad grades and received "whippings with a belt." Shana told the social worker that she believes that she was an excellent mother. James Sr. thought that he was an "average or good" father.

At the time of the study, James Sr. was making $1,770 a month as a truck driver. Shana was making $1,000 a month and operating two small businesses. The Mon-

roes were living in a townhouse that they had been renting for two years in Missouri City, Texas. The Monroes did not have health insurance at the time of the study. Both Shana and James Sr. have no criminal records and deny any history of psychological treatment. The Monroes also did not own any items necessary for raising a small child but they were waiting to purchase these items until they found out if James Jr. was the father.

All the references contacted by the social worker stated the Monroes would be good parents for J.A.M.J. Pastor Bryan Watson described the Monroe household as a "strong Christian home." Shana acknowledged that J.A.M.J. might have behavior issues if the court granted conservatorship rights to the Monroes and moved J.A.M.J. away from the Williams. The Monroes told the social worker, "If this is our grandchild we would like a shot at raising the child." When asked about his motivation in seeking to make J.A.M.J. a part of his family, James Sr. stated, "I am backing my son and my wife . . . if they want to do this I support it."

The court also admitted several social studies monitoring J.A.M.J.'s progress with the Williams. The reports state that J.A.M.J. is doing well in all areas of development, and knows and has bonded with the Williams family. Both Corey and Angela Williams are very active in J.A.M.J.'s care and the Williams' two other children help in any way they can. The Williams spend weekends at the lake in the summer and they enjoy a lot of family time. Both Corey's and Angela's extended families, as well as the community in general, are very supportive of the Williams' decision to adopt. In the opinion of the social worker, the placement of J.A.M.J. with the Williams is going very well and the Williams are raising J.A.M.J. in a very secure, stable, and nurturing environment.

The adoptive family assessment conducted on the Williams family was also positive. Corey works as a chiropractor, has a successful practice, and makes about $60,000 a year. Angela works as a teacher and makes around $26,000 a year. The Williams have health insurance, as well as retirement accounts and life insurance policies.

The social worker described Corey as mature and stable, as well as an all-around nice person who is well-respected in the community. The social worker described Angela as being friendly, outgoing, and full of energy. Neither Corey nor Angela has a criminal record. The Williams have two boys who were ages eleven and nine at the time of the study. Both boys are well-mannered, respectful, polite, and are very happy to have a new sister. The Williams discipline by either grounding or revoking privileges. The Williams have a four-bedroom home in Lisbon, North Dakota and they regularly attend church. Although Lisbon does not have an organized adoption support group, the Williams know other families who have adopted children.

Due to a strained relationship with her mother, Angela moved away from home when she was a senior in high school. For the next two years, Angela lived with Fern and Harris Bailey. Today, the Baileys consider Angela their daughter and Angela sees them as her family. The Baileys also helped Angela re-establish some relationship with her parents. Angela's mother, however, refused to complete a reference for the purposes of the adoption of J.A.M.J.

Viewing all the evidence in the light most favorable to the verdict, and considering the pertinent *Holley* and Family Code section 263.307 factors, we hold that the evidence presented at the termination trial would enable reasonable and fair-minded people to reach the verdict under

review. *See City of Keller,* 168 S.W.3d at 827. Considering all the evidence supporting and contradicting the finding, we cannot say the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain,* 709 S.W.2d at 176. The evidence is legally and factually sufficient to support the trial court's presumed finding that appointment of the Monroes as managing conservators would not be in the best interest of J.A.M.J. We therefore hold that the trial court did not abuse its discretion in appointing AIM as sole managing conservator of J.A.M.J. *See Turner,* 47 S.W.3d at 763; *see also Lenz,* 79 S.W.3d at 19 (holding evidence was sufficient to support trial court's conservatorship determination).

### Jury Trial

In their third issue, James Jr. and the Monroes contend that the trial court abused its discretion in denying their request for a jury trial. AIM and the Williams respond that the trial court did not abuse its discretion because the written request for a jury trial was not filed at least thirty days before trial.

The Texas Constitution guarantees the right to a trial by jury. TEX. CONST. art. I, § 15 ("The right of trial by jury shall remain inviolate."); TEX. CONST. art. V, § 10 (stating that "no jury shall be empaneled in any civil case unless demanded by a party to the case, and a jury fee be paid by the party demanding a jury, for such sum, and with such exceptions as may be prescribed by the Legislature"). We recognize that "[t]he right to jury trial is one of our most precious rights, holding 'a sacred place in English and American history.'" *Gen. Motors Corp. v. Gayle,* 951 S.W.2d 469, 476 (Tex.1997) (quoting *White v. White,* 108 Tex. 570, 196 S.W. 508, 512 (1917)). A party may demand a jury trial in cases governed by the Family Code,

except in suits where adoption is sought, and in suits to adjudicate parentage under Chapter 160. TEX. FAM.CODE ANN. § 105.002(a)-(b) (Vernon Supp.2006).

We review the trial court's denial of a party's demand for a jury trial under an abuse of discretion standard. *Mercedes–Benz Credit Corp. v. Rhyne,* 925 S.W.2d 664, 666 (Tex.1996). In conducting an abuse of discretion review, we examine the entire record. *Id.* We only find an abuse of discretion when the trial court's decision is arbitrary, unreasonable, and without reference to guiding principles. *Id.*

A request for a jury trial and payment of the jury fee must be made "a reasonable time before the date set for trial of the cause on the non-jury docket, but not less than thirty days in advance." TEX.R. CIV. P. 216; *Huddle v. Huddle,* 696 S.W.2d 895, 895 (Tex.1985) (holding that time limitations for requesting jury trial apply to payment of jury fee as well). A jury request and jury fee payment by one party inures to the benefit of all other parties to the suit, even if the requesting party is absent at trial. *See Gen. Motors Corp. v. Gayle,* 924 S.W.2d 222, 225 n. 1 (Tex.App.-Houston [14th Dist.] 1996, orig. proceeding), *leave granted, mand. denied,* 940 S.W.2d 598 (Tex.1997); *Roberts v. Mullen,* 417 S.W.2d 74, 77 (Tex.Civ.App.-Dallas 1967) ("It is well settled that when one party demands a trial by jury and pays the required jury fee, the right thus secured to him inures to all other parties to the suit."), *aff'd,* 423 S.W.2d 576, 579 (Tex.1968).

It is within the discretion of the trial court to deny a jury trial in the absence of a timely request or payment of a jury fee. *Huddle,* 696 S.W.2d at 895; *Martin v. Black,* 909 S.W.2d 192, 197 (Tex. App.-Houston [14th Dist.] 1995, writ de-

nied). An untimely jury demand should be granted, however, if it can be done (1) without interfering with the court's docket, (2) delaying the trial, or (3) injuring the opposing party. *See Ferguson v. DRG/Colony N., Ltd.,* 764 S.W.2d 874, 881 (Tex.App.-Austin 1989, writ denied); *see also Barkhausen v. Craycom, Inc.,* 178 S.W.3d 413, 418 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) (holding that even if party fails to timely pay jury fee, trial courts should accord right to jury trial if it can be done without interfering with court's docket, delaying trial, or injuring opposing party); *Gayle,* 951 S.W.2d at 476 (same).

Here, the Monroes intervened in this suit on June 27, 2005. James Jr. paid the jury fee on July 13, 2005, but did not file a written request for a jury trial at that time. James Jr. paid another jury fee on September 1, 2005, but once again did not file a written request for a jury trial. He then filed a written request for a jury trial on October 25, 2005, one week before the November 1 trial setting. The trial court denied James Jr.'s request for a jury trial on November 1, 2005, the day of the termination trial. The November 1 trial setting was at least the fourth time this case had been set for trial, a case involving the termination of parental rights and determination of the home for a then two-year-old child.

The trial court did not abuse its discretion in denying the request for a jury trial in this case. *See Gayle,* 924 S.W.2d at 225 n. 1. James Jr. paid the jury fee more than thirty days before trial on two separate occasions, but he did not file a written request for a jury trial until one week before the November 1 trial setting. *See* Tex.R. Civ. P. 216; *see also Huddle,* 696 S.W.2d at 895; *Martin,* 909 S.W.2d at 197. The Monroes and James Jr. did not attempt to demonstrate that granting the request for a jury trial would not interfere with the court's docket, delay the trial, or injure the opposing parties. Furthermore, no party moved for a continuance following the denial of the jury request. *Halsell v. Dehoyos,* 810 S.W.2d 371, 371 (Tex.1991) (holding that untimely request for jury trial becomes timely when trial is thereafter reset more than thirty days after request). We hold that the trial court did not abuse its discretion in denying the request for a jury trial. *See Huddle,* 696 S.W.2d at 895 (holding trial court did not abuse its discretion in denying request for jury trial when plaintiff timely paid jury fee but did not timely request jury trial); *Barkhausen,* 178 S.W.3d at 418 (holding trial court did not abuse its discretion in denying request for jury trial when request was untimely).

## Conclusion

We hold that (1) the evidence is legally sufficient to support the trial court's presumed finding that James Jr.'s affidavit of relinquishment was voluntarily executed, (2) the trial court did not abuse its discretion in denying conservatorship rights to the Monroes, and (3) the trial court did not abuse its discretion in denying the request for a jury trial. We therefore affirm the orders of the trial court. Any pending motions are dismissed as moot.