**INSURANCE CORPORATION OF HANNOVER, Appellant,**

v.

**Judy POLK and Marcia Moore, Appellees.**

**No. 11–06–00336–CV.**

Court of Appeals of Texas, Eastland.

July 17, 2008.

Rehearing Overruled Aug. 21, 2008.

---

H. Allen Pennington, Jr., P. Markus Kypreos, Pennington Hill, LLP, Fort Worth, TX, for appellant.

Coby D. Smith, Brackett & Ellis, P.C., Attorneys At Law, Fort Worth, Isaac M. Castro, Law Office of Isaac M. Castro, Attorneys At Law, Hamlin, TX, for appellees.

Panel consists of WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

JIM R. WRIGHT, Chief Justice.

Judy Polk and Marcia Moore sued Insurance Corporation of Hannover alleging breach of an insurance policy, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code.[1] Following a bench trial, the trial court entered a judgment in favor of Polk and Moore on their claims. The trial court awarded Polk and Moore actual damages in the amount of $40,000 and extra-contractual damages under the Insurance Code in the amount of $120,000. The trial court also awarded Polk and Moore attorney's fees, prejudgment interest on the actual damages awarded, postjudgment interest, and court costs. Hannover attacks the trial court's judgment in seven issues. We modify the amount of damages awarded by the trial court, and we affirm the judgment as modified.

### Background Facts

Polk and Moore owned a thoroughbred racing horse named Smart Score. Hannover issued Polk and Moore an equine-livestock mortality insurance policy. Under the policy, Smart Score was insured for $40,000. The policy had a policy period from June 28, 2002, to June 28, 2003. The policy also contained a thirty-day extension clause. The extension clause provided that "this [i]nsurance is extended to cover the death of any animal insured occurring within thirty (30) days after the expiration date [of the policy] as the result of any accident occurring, or illness or disease manifesting itself, during the [policy period]."

During the policy period, Smart Score fractured his right knee. On May 31, 2003, Dr. Wes Vogt x-rayed Smart Score's right knee, and the X-rays showed that Smart Score had fractures in it. On June 30, 2003, Dr. Stephen K. Derwelis took X-

1. Polk and Moore alleged that Hannover violated Chapter 541 of the Insurance Code in various respects. TEX. INS.CODE ANN. ch. 541 (Vernon Pamph.2007). Chapter 541 became effective on April 1, 2005. Polk and Moore complain of conduct that occurred in 2003. At that time, TEX. INS.CODE. art. 21.21 (2003) was in effect. The legislature recodified existing statutes without intending substantive changes to the law. TEX. INS.CODE ANN. § 30.001 (Vernon Pamph.2007). Because the legislature made no substantive changes to Article 21.21 in enacting Chapter 541 and because no one has raised an issue as to which statute controls, we will address Polk and Moore's Insurance Code claims under the current version of the statute.

rays of both of Smart Score's knees. These X-rays showed that Smart Score had fractures in both of his knees. Dr. Derwelis scheduled surgery to repair Smart Score's knees on July 2, 2003. Hannover agreed that, if Smart Score died during the surgery, his death would be covered under the thirty-day extension clause in the policy. Dr. Derwelis performed the surgery on July 2, 2003. After the surgery, Dr. Derwelis reported that Smart Score's prognosis for life was good, and Dr. Derwelis believed that Smart Score might be able to return to racing. On July 5, 2003, Dr. Derwelis discharged Smart Score from his care, and Smart Score's trainer Richard Joe Hodges transported Smart Score to a stall at a racetrack in Ruidoso, New Mexico.

On July 14, 2003, at about 6:30 a.m., Dr. Michael Lynn Fox received a telephone call that Smart Score needed treatment in his stall. Dr. Fox arrived at Smart Score's stall and found that Smart Score had bloody, projectile diarrhea. Dr. Fox diagnosed Smart Score with colitis. Dr. Fox hoped to stabilize Smart Score so that Smart Score could be transported to Dr. Derwelis's office for further treatment. Dr. Fox administered IV fluids in an attempt to stabilize Smart Score. However, Smart Score could not be stabilized. Smart Score went down in his stall and could not get up. At about 11:15 a.m., it became necessary for Dr. Fox to euthanize Smart Score.

Polk and Moore asserted that Smart Score's death was covered under the thirty-day extension clause in the policy. They submitted a proof of loss to Hannover. Polk's husband Jerry Don Polk handled the details of the claim. Richard Steven Klopp, a senior mortality claims specialist for Hannover, handled the claim on behalf of Hannover. The primary issue relating to the claim was whether Smart Score's death, which was caused by the colitis, resulted from a condition that manifested itself during the policy period. If Smart Score's death resulted from such a condition, then the policy provided coverage for the death under the thirty-day extension clause. Klopp believed that the colitis did not result from a condition that manifested itself during the policy period. Rather, he believed that the colitis was a "new" illness that first showed symptoms on July 14, 2003. Therefore, Klopp concluded that Smart Score's death was not covered under the thirty-day extension clause in the policy. Instead, Klopp believed that Smart Score's death fell within the policy period (June 28, 2003, to June 28, 2004) of a renewal policy. Klopp contended that Smart Score was insured for $5,000 under the renewal policy. Based on Klopp's decision, Hannover denied Polk and Moore's claim for coverage under the original policy and offered them $5,000 under the renewal policy; they did not accept the offer and filed this suit.

### Proceedings in the Trial Court

Polk and Moore filed their original petition on October 31, 2003. They alleged that Smart Score had been injured in a race on or about May 25, 2003. They further alleged that Smart Score had died on July 14, 2003, as a result of surgery that had been performed to repair the injury that had occurred on or about May 25, 2003. Therefore, they alleged that Smart Score's death was covered under the thirty-day extension clause in the policy. Polk and Moore alleged claims for breach of contract and breach of the duty of good faith and fair dealing. On December 5, 2003, Hannover filed its answer to the petition.

This cause was set for trial on May 22, 2006. The record shows that the parties received, at a minimum, about four months

notice of the trial setting. On April 21, 2006, Polk and Moore filed their first amended petition. They continued to allege claims for breach of contract and breach of the duty of good faith and fair dealing, and they added a claim for alleged violations of Chapter 541 of the Texas Insurance Code.

A dispute arose as to whether this cause was set for jury trial or nonjury trial. At a hearing on May 2, 2006, the trial court addressed the "issue as to whether or not a jury fee—a jury request was properly paid and requested." Hannover wanted a jury trial, and Hannover's counsel informed the trial court that it believed the case was on the jury docket. However, Hannover had failed to comply with the requirements for obtaining a jury trial under Tex.R. Civ. P. 216. Polk and Moore opposed a jury trial. Polk and Moore's counsel informed the court that, in October 2005, he had determined that no jury fee had been paid and that, on a later occasion, he had again determined that no jury fee had been paid and that no jury request had been made.

On May 4, 2006, the trial court ruled that the case was set for a bench trial on May 22, 2006. On May 9, 2006, Hannover filed a written demand for jury trial. On May 12, 2006, Hannover filed a motion to strike the case from the nonjury docket and a motion for continuance. The record does not indicate whether Hannover attempted to obtain a hearing on these motions before the date of the trial setting. The bench trial began on May 24, 2006, instead of May 22, 2006. When the trial court called the case for trial, Hannover's counsel stated that Hannover's motion to strike the case from the nonjury docket and motion for continuance were pending. The trial court permitted Hannover to proceed on the motions. After hearing brief arguments from counsel, the trial court denied both motions, and the parties proceeded to trial.

During the bench trial, Hannover asserted that Smart Score's surgery did not cause the colitis and that, because the surgery did not cause the colitis, Smart Score's death did not result from an accident occurring or illness or disease manifesting itself during the policy period. Therefore, Hannover claimed that Smart Score's death was not covered under the thirty-day extension provision in the policy.

After the bench trial, the trial court entered its judgment in favor of Polk and Moore. The trial court awarded Polk and Moore actual damages representing the policy proceeds in the amount of $40,000, additional damages in the amount of $120,000, attorney's fees in the amount of $52,507.04 through trial, additional attorney's fees in the event that they were successful in any appeals, prejudgment interest, postjudgment interest, and court costs. The trial court entered findings of fact and conclusions of law in support of its judgment. In a conclusion of law, the trial court stated that "[Polk and Moore] were entitled to recover additional damages in the sum of $120,000.00 for [Hannover's] knowing violations of Texas Insurance Code Chapter 541."

*Issues on Appeal*

Hannover presents seven issues for review. In its first issue, Hannover asserts that the trial court erred in ruling that it was not entitled to a jury trial. In its second through fifth issues, Hannover challenges the legal and factual sufficiency of the evidence to support the trial court's findings that it breached the insurance contract, that it breached the duty of good faith and fair dealing, that it violated the Texas Insurance Code, and that it violated the Texas Deceptive Trade Practices–Con-

sumer Protection Act (DTPA).[2] In its sixth issue, Hannover contends that the trial court erred in finding that it had improperly cancelled a renewal policy because those findings were irrelevant to the determination of the issues before the trial court. In its seventh issue, Hannover asserts that the trial court erred in awarding $40,000 "policy proceeds" as damages on Polk and Moore's extra-contractual claims and $120,000 as "additional damages."

### Jury Trial Issue

We review a trial court's denial of a jury trial under an abuse of discretion standard. *Mercedes–Benz Credit Corp. v. Rhyne,* 925 S.W.2d 664, 666 (Tex.1996); *Howell v. Tex. Workers' Comp. Comm'n,* 143 S.W.3d 416, 438 (Tex.App.-Austin 2004, pet. denied). We only find an abuse of discretion when the trial court's decision is arbitrary, unreasonable, and without reference to guiding principles. *Rhyne,* 925 S.W.2d at 666.

The Texas Constitution guarantees the right to a jury trial. TEX. CONST. art. I, § 15. However, the right to a jury trial is not absolute in civil cases. *See Howell,* 143 S.W.3d at 438. The Texas Constitution provides that "no jury shall be empaneled in any civil case unless demanded by a party to the case, and a jury fee paid by the party demanding a jury, for such sum, and with such exceptions as may be prescribed by the Legislature." TEX. CONST. art. V., § 10. To obtain a jury trial, a party must comply with the requirements set forth in Rule 216 of the Rules of Civil Procedure: the party must file a written request for a jury trial with the clerk of the court and pay the jury fee not less than thirty days before the date set for trial of the cause on the nonjury docket. TEX.R. CIV. P. 216.

In this cause, Hannover did not comply with Rule 216. The cause was set for trial on May 22, 2006. Hannover paid the jury fee on April 25, 2006, and filed its written request for a jury trial on May 9, 2006. Thus, Hannover paid the jury fee and filed its request for a jury trial less than thirty days before the case was set for trial. Courts have stated that it is within the discretion of the trial court to deny a jury trial in the absence of a timely request or payment of a jury fee. *Monroe v. Alternatives in Motion,* 234 S.W.3d 56, 69 (Tex.App.-Houston [1st Dist.] 2007, no pet.); *Martin v. Black,* 909 S.W.2d 192, 197 (Tex.App.-Houston [14th Dist.] 1995, writ denied). However, a trial court should grant an untimely request for a jury trial if it can be done without (1) interfering with the court's docket, (2) delaying the trial, or (3) injuring the opposing party. *Monroe,* 234 S.W.3d at 70; *see also Barkhausen v. Craycom, Inc.,* 178 S.W.3d 413, 418 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) (late payment of jury fee).

At the May 2 hearing, Hannover's counsel stated that Hannover believed the case was on the jury docket. To support its belief, Hannover's local counsel stated that the parties had filed motions in limine and that motions in limine were appropriate only in jury cases. Hannover's lead counsel stated that she had received a proposed discovery control plan from Polk and Moore's counsel that referred to motions in limine and that she had never seen a motion in limine used in a bench trial. Hannover's lead counsel also stated that, during a hearing that had been held on motions to bifurcate, "[W]e all talked about how it should be done in front of the jury."

Hannover filed its motion to strike the case from the nonjury docket and its mo-

**2.** TEX. BUS. & COM.CODE ANN. §§ 17.41–.63 (Vernon 2002 & Supp.2007).

tion for continuance on May 12, 2006, ten days before the trial setting. In these motions, Hannover raised the motion in limine and bifurcation issues.[3] Hannover also stated in its motion to strike the case from the nonjury docket that "[its] counsel discussed with the [c]ourt at least three times that this case was on the jury docket." Specifically, Hannover stated that its lead counsel had called "the [c]ourt during the April trial setting" and "during the May trial setting" and that, on both occasions, she had been told the case was "on the jury roster." Hannover also stated that its local counsel had gone to the courthouse on April 25, 2006, and that he had been told the case was "on the jury roster."

The record does not reflect that Hannover requested a hearing on its motion to strike the case from the nonjury docket and its motion for continuance before the date of the trial setting. The trial court permitted Hannover to proceed with the motions on the morning of the trial setting. Hannover did not present any further evidentiary support for the motions and did not attempt to demonstrate that granting its late request for a jury trial would not interfere with the trial court's docket, delay the trial, or injure Polk and Moore. Instead, Hannover again stated its belief that the case had been set on the jury docket. The trial court denied both motions.

The trial court heard Hannover's motion to bifurcate on January 25, 2006. As of that date, the parties had ample time to comply with Rule 216. The trial court entered the discovery control plan on February 1, 2006. In its discovery control plan, the trial court stated that the case was set for trial on May 22, 2006, and

provided that motions in limine had to be filed thirty days before trial. In the discovery control plan, the trial court did not state whether the case was set for jury trial or nonjury trial. The trial court entered the discovery control plan more than three months before the trial setting, and the parties had time to comply with the requirements of Rule 216. The fact that the trial court and the parties addressed matters related to a jury trial more than three months before trial does not support Hannover's contention that the trial court abused its discretion in later denying Hannover's untimely request for a jury trial.

The evidence showing that Hannover's counsel had discussions with "the [c]ourt" about the case being on the "jury roster" supports Hannover's contention that it believed the case was on the jury docket. However, this evidence does not show that granting Hannover's untimely request for a jury trial could have been done without (1) interfering with the trial court's docket, (2) delaying the trial, or (3) injuring Polk and Moore.

At Hannover's request, the clerk of the trial court filed a supplemental clerk's record in this appeal. The supplemental record includes a jury list showing that the clerk had summoned 150 potential jurors for service in the trial court on May 22, 2006, at 9:00 a.m. Hannover asserts that the potential jurors were summoned for jury duty in this case. However, when the trial court heard Hannover's motion for continuance on May 24, 2006, Hannover's counsel stated that "the motion for continuance [was] based on allowing the [c]ourt to call a jury in to put it back on the jury docket." Nothing in the record indicates

---

**3.** Hannover's lead counsel signed verifications stating that the factual statements in the motion to strike the case from the nonjury

docket and in the motion for continuance were true and correct.

that the potential jurors were assembled for this case or that a jury panel was present when the trial court called this case for trial on May 24, 2006.

Hannover relies on *Gen. Motors Corp. v. Gayle*, 951 S.W.2d 469 (Tex.1997). In *Gayle*, the trial court set the case for trial on January 3, 1996. The defendant believed that another party to the case had paid the jury fee and that the case was on the jury docket. When the defendant appeared in the trial court on the date of the trial setting, it discovered that no party had paid a jury fee and that, therefore, the case was on the nonjury docket. The trial court informed the parties that it intended to begin the nonjury trial two days later. The defendant immediately paid the jury fee and filed an objection to the trial court setting the case on the nonjury docket. The defendant also moved for a continuance of the January 5 trial setting on the ground that the case was not ready for trial because of pending discovery issues. The defendant further asserted that a continuance of the trial setting was necessary to allow its payment of the jury fee to become timely.

In *Gayle*, the trial court denied the defendant's motion for continuance but conceded that the case was not ready for trial. The trial court stated that "this case still has some discovery that needs to be done." *Id.* at 471. Because of discovery issues that needed to be resolved, the trial court decided not to hear any evidence in the case until January 29, twenty-six days after the defendant paid the jury fee. The trial court also acknowledged that outstanding discovery issues would probably cause additional interruptions to the trial proceedings. The Texas Supreme Court held that the trial court had abused its discretion in denying the defendant's motion for continuance:

[T]he trial judge commenced the nonjury trial in the teeth of a demand for a jury trial, timing the proceedings to avoid the requirements of Rule 216(a), with no expectation of reaching the heart of the case for some weeks or months. In light of such preordained delays, [the defendant] established that a thirty-day continuance to perfect [its] jury trial demand would not cause [the plaintiffs] any injury or delay. In fact, the trial court's seriatim trial schedule seems only a sham to hold [the defendant] to its mistake in not paying the jury fee without penalizing the other side. Under these particular and unusual circumstances, we hold that the trial court abused its discretion by not granting a continuance to allow [the defendant's] jury request and fee to become timely.

*Id.* at 477.

This case is factually distinguishable from *Gayle*. The bench trial in this case began on May 24, 2006. At that time, this case was ready for trial. The parties proceeded to trial and completed the trial without delay. The facts in this case are unlike the "particular and unusual circumstances" involved in *Gayle*. The record in this case does not establish that granting Hannover a continuance to perfect its jury demand would not have caused Polk and Moore any damage or delay.

Hannover also relies on *Aronoff v. Texas Turnpike Authority*, 299 S.W.2d 342 (Tex. Civ.App.-Dallas 1957, no writ). In *Aronoff*, the appellants timely requested a jury. The appellee expected a jury trial and joined with the appellants in seeking a jury trial. In response to the request, the trial court set the case for trial. In *Aronoff*, the record showed that the appellants, the appellee, and the trial court all understood and anticipated that the trial would be to a jury. However, on the

morning of trial, the trial court discovered that no jury fee had been paid. Although a jury was available, the trial court informed the parties that the case would be tried to the court. The appellants objected, paid the jury fee, and filed a motion requesting a jury trial. The appellee informed the trial court that it had prepared for a jury trial and that it was willing to go forward with either a nonjury or a jury trial. The appellee also stated that it would agree to a continuance of the trial so that a jury trial could be set at a later date. However, the trial court overruled the appellants' motion requesting a jury trial. The court of appeals held that the trial court had abused its discretion in denying the appellants' request for a jury trial. *Id.* at 344–46. Given the appellee's willingness to proceed to a jury trial and to postpone the case if necessary, the court concluded that granting a jury trial would not have injured the appellee. *Id.* at 345. Based on a consideration of the entire record, the court also concluded that granting a jury trial would not have disrupted the trial court's docket or seriously interfered with and impeded the ordinary handling of the trial court's business. *Id.*

This case is factually distinguishable from *Aronoff*. Polk and Moore opposed Hannover's untimely request for a jury trial. Also, even if Hannover anticipated a jury trial, the record does not show that Polk, Moore, and the trial court understood and anticipated that there would be a jury trial.

The record does not demonstrate that granting Hannover's late request for a jury trial could have been done without (1) interfering with the trial court's docket, (2) delaying the trial, or (3) injuring Polk and Moore. Therefore, the trial court did not abuse its discretion in denying (1) Hannover's request for a jury trial, (2) Hannover's motion to strike the case from the nonjury docket, and (3) Hannover's motion for continuance. We overrule Hannover's first issue.

### Sufficiency of the Evidence

■■■■ The trial court entered findings of fact and conclusions of law. We review a trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002). We review a trial court's findings of fact for legal and factual sufficiency under the same standards we apply in reviewing a jury's findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991). In analyzing a legal sufficiency challenge, we must determine whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). We must review the evidence in the light most favorable to the challenged finding, crediting any favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Id.* at 821–22, 827. We may sustain a no-evidence or legal sufficiency challenge only when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L.Rev. 361, 362–63 (1960)).

■■■■ In analyzing a factual sufficiency challenge, we must consider and weigh all of the evidence to determine whether the evidence in support of a finding is so weak as to be clearly wrong and unjust or

whether the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001); *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). In a bench trial, the trial court alone determines the credibility of the witnesses and the weight to be given their testimony, and it may accept or reject all or any part of that testimony. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986); *Nordstrom v. Nordstrom,* 965 S.W.2d 575, 580–81 (Tex.App.-Houston [1st Dist.] 1997, pet. denied); *Sw. Bell Media, Inc. v. Lyles,* 825 S.W.2d 488, 493 (Tex.App.-Houston [1st Dist.] 1992, writ denied).

### Coverage Under the Policy

In its second issue, Hannover challenges the legal and factual sufficiency of the evidence to support the trial court's findings of breach of contract. The evidence showed that the policy had a policy period from June 28, 2002, to June 28, 2003. The policy contained a clause extending coverage for death occurring within thirty days after June 28, 2003 "as the result of any accident occurring, or illness or disease manifesting itself, during the [policy period]." Dr. Vogt took X-rays of Smart Score on May 31, 2003. These X-rays revealed that Smart Score had a fracture in his right knee. Hannover does not dispute that Smart Score's right knee fracture occurred within the policy period. Dr. Derwelis performed Smart Score's knee surgery on July 2, 2003, within the thirty-day extension period. After contracting colitis, Smart Score had to be euthanized by Dr. Fox on July 14, 2003, also within the thirty-day extension period. Hannover agrees that, if the colitis resulted from the surgery, Smart Score's death was covered under the thirty-day exten-

sion clause in the policy. Hannover states the following in its appellate brief:

> The issue in the case was whether the surgery caused the colitis, and it has always been agreed by Hannover that if it could be established that the death was caused by the surgery, Smart Score had $40,000.00 of coverage under the thirty day extension of the Policy. The existence of the coverage has never been in dispute, only whether the claim was covered under the Policy.

Hannover challenges the legal and factual sufficiency of the evidence to support a number of the trial court's findings of fact, including the following findings:

10. Smart Score later suffered from colitis as a direct result of the surgery done to repair the fracture.

12. The colitis was caused by the stress of the injury, the surgery, the transportation to and from the clinic where the surgery was performed, the medications prescribed, and the postsurgical care required by the surgeon.

Hannover contends that, because the evidence was legally and factually insufficient to establish that the colitis resulted from the surgery, the evidence did not establish that Smart Score's death resulted from a condition (the knee injury) that manifested itself during the policy period. Therefore, Hannover argues that the trial court erred in finding that Smart Score's death was covered under the thirty-day extension clause.

Dr. Fox treated Smart Score on July 14, 2003. At that time, Smart Score had bloody, projectile diarrhea. After attempts to stabilize Smart Score were unsuccessful, Dr. Fox had to euthanize him. Dr. Fox testified that the cause of Smart Score's death was "[d]ehydration due to an extremely acute/peracute colitic incident" and that "colitis was the precipitating

cause of death." Dr. Fox explained a number of facts about diarrhea and colitis in horses: diarrhea is a life-threatening situation for horses; colitis is the most common reason for diarrhea in horses; dehydration is basically the cause of death of horses that have colitis; colitis is almost always caused by "an infection and overgrowth of a normally occurring bacteria in [a horse's] gut"; stress to a horse causes the bacteria to grow; colitis is a stress-related disease; surgery is a precipitating cause of stress to horses; and any change in a horse's life, such as shipping the horse, is a precipitating cause of stress in horses.

Dr. Fox testified that Smart Score's surgery had been the only change to his normal routine. Dr. Fox said that the stress Smart Score experienced from the surgery was a precipitating factor in the colitis. Dr. Fox testified that "one of the things that had to be, in [his] opinion, a precipitating factor in a colitis would be the fact that the horse had arthroscopic surgery approximately ... 14 days prior to this incident."

Dr. Vic Alan Burk testified as an expert witness on behalf of Polk and Moore. He testified that he had read Dr. Fox's and Dr. Derwelis's depositions and the exhibits to their depositions. Dr. Burk said that colitis is an inflammation of the colon or large intestine and that abdominal discomfort and diarrhea are the main symptoms of colitis. He also testified that bacterial infections can cause colitis and that stress and medications can induce colitis. Dr. Burk identified a number of stress factors that had occurred in Smart Score's life: he had been shipped to the surgery; he had undergone surgery on both knees; he had been given anesthesia, antibiotics, and anti-inflammatory medication in connection with the surgery; and he had been shipped back to his stable. Dr. Burk said

that the antibiotics that were given to Smart Score in connection with the surgery could have contributed to the colitis. Dr. Burk testified that, in reasonable medical certainty, (1) the direct specific cause of Smart Score's colitis was clostridium perfringens infection that was usually associated with stress or antibiotics and (2) he felt like "the stress of the shipping, surgery, shipping back, [it was] the whole combination of those things that induced the colitis."

Dr. Derwelis performed Smart Score's knee surgery on July 2, 2003. He testified that he did not know what caused Smart Score's colitis. Dr. Derwelis testified that, when Smart Score left his clinic on July 5, 2003, Smart Score looked fine and walked out of the stall without a limp. Dr. Derwelis said that he did not receive any calls about Smart Score from July 5, 2003, to July 14, 2003. He said that, on July 14, 2003, Dr. Fox called and told him that Smart Score had severe diarrhea and was very sick. Dr. Derwelis told Dr. Fox that he would take Smart Score at his clinic if Smart Score could be stabilized enough for travel. Dr. Derwelis testified that Klopp, an adjuster for Hannover, called later that day and told him that Smart Score had died.

Dr. Derwelis also testified that, in his opinion, Smart Score's colitis was not caused by the surgery. He said that, in all other cases of postoperative diarrhea that had occurred after he had performed surgery, the diarrhea had occurred within forty-eight hours of the surgery. He said that colitis could be caused by infectious agents. He also said that colitis could be caused by clostridium difficile and that most cases of clostridium difficile colitis arise when horses are on antibiotics or immediately after antibiotics are given. Dr. Derwelis also testified that, in a num-

ber of cases, the cause for a horse's diarrhea was unknown.

Dr. Derwelis wrote Jerry Polk a letter in which he stated that "[d]iarrhea disease occurs generally in a horse that is stressed." Dr. Derwelis said that he did not consider stress to be the number one cause of colitis. He said that some colitis cases are stress-related. Dr. Derwelis testified that a number of things caused stress to Smart Score: shipping him to surgery, anesthetizing him for surgery, the surgery itself, and shipping him back to Ruidoso after the surgery.

■ Applying the applicable standards of review, the evidence is legally and factually sufficient to support the trial court's finding that Smart Score's colitis resulted from his surgery. The evidence showed that Smart Score fractured his right knee during the policy period and that Dr. Derwelis performed the surgery to repair both of Smart Score's knees during the thirty-day extension period. Smart Score died as a result of colitis twelve days after the surgery. Smart Score's death occurred during the thirty-day extension period. Dr. Fox testified that the stress Smart Score experienced from the surgery was a precipitating factor in Smart Score's colitis and that the colitis was a precipitating cause of Smart Score's death. Dr. Fox's testimony supports the conclusion that the colitis resulted from the knee surgery and that, therefore, coverage for Smart Score's death existed under the thirty-day extension clause in the policy. Additionally, Dr. Burk testified that he felt like the stress Smart Score experienced from shipping to the surgery, the surgery, and the return shipping induced the colitis. Dr. Fox's and Dr. Burk's testimony supported the trial court's finding that the colitis resulted from the surgery.

Hannover attacks Dr. Burk's credibility. Dr. Burk did not treat Smart Score. His opinions were based on a review of Dr. Fox's and Dr. Derwelis's depositions and the exhibits to their depositions. Hannover contends that "Dr. Burk's conclusions were contradictory to the treating veterinarians' findings." Therefore, Hannover asserts that "Dr. Burk's testimony should be looked at in a questionable and dubious light." However, the trial court was the sole judge of the credibility of the witnesses. *Lyles,* 825 S.W.2d at 493.

The evidence is legally and factually sufficient to support a conclusion that Smart Score died as the result of an accident that occurred or an illness or disease that manifested itself during the policy period. Therefore, the trial court did not err in concluding that the policy covered Smart Score's death and that Hannover breached the insurance policy. We overrule Hannover's second issue.

In its third issue, Hannover challenges the trial court's finding of fact that "Hannover agreed that it would pay the policy limits of $40,000.00 if a 'link' was established between the surgery and the colitis that led to Smart Score's death." Hannover contends that this finding contradicts the requirement in the extension clause that the death occur "as [the] result of any accident occurring, or illness or disease manifesting itself, during the [policy period]." Hannover asserts that we should disregard the trial court's finding and that we should decide the case based upon the express provision in the policy. We have held that the evidence is legally and factually sufficient to establish the requirements for coverage under the thirty-day extension clause. Therefore, we need not address the merits of Hannover's third issue. Tex.R.App. P. 47.1.

*Extra–Contractual Claims*

The trial court found that Hannover engaged in conduct in violation of its duty of

good faith and fair dealing, that Hannover committed unfair settlement practices in violation of Section 541.060 of the Texas Insurance Code, and that Hannover committed acts in violation of Section 17.46(b) of the DTPA. In its fourth issue, Hannover challenges the legal and factual sufficiency of the evidence to support these findings and the trial court's award of additional damages on Polk and Moore's extra-contractual claims. In response, Polk and Moore assert that the evidence is legally and factually sufficient to support the trial court's findings that Hannover committed unfair settlement practices in violation of Section 541.060(a) of the Insurance Code and that Hannover knowingly committed the unfair settlement practices.

Section 541.060(a) of the Texas Insurance Code prohibits a number of unfair settlement practices, providing in relevant part:

(a) It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary:

(2) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of:

(A) a claim with respect to which the insurer's liability has become reasonably clear;

(7) refusing to pay a claim without conducting a reasonable investigation with respect to the claim.

The trial court concluded that Hannover violated Section 541.060(a)(2)(A) and (a)(7) among others.

Klopp testified that his duties at Hannover included investigating and settling livestock mortality claims. Klopp handled Polk and Moore's claim relating to the death of Smart Score. Polk and Moore introduced into evidence a copy of Klopp's claim file activity record relating to the claim.

Klopp testified that the purpose of Smart Score's surgery was to remove bone chips from his front leg. Smart Score developed colitis after the surgery, and the colitis caused Smart Score's death. Klopp did not know what caused Smart Score's colitis. According to Klopp, if surgery was necessary as a result of Smart Score's knee injury and if the surgery caused the colitis, then Smart Score's death would have been covered under the thirty-day extension clause. Klopp explained that, for coverage to exist under the extension clause, the death of the animal must be related to an illness or injury that manifests itself during the policy period.

Klopp also testified that, on July 14, 2003, he received a telephone call from Jerry Polk in which Mr. Polk told him that Smart Score had projectile diarrhea and that Dr. Fox wanted to put Smart Score down. On that same day, Klopp filled out an initial telephone claims report. In the report, Klopp stated that the policy effective date was June 28, 2003, and that the insured amount was $5,000. On July 14, 2003, Klopp called Dr. Fox to determine the severity of Smart Score's condition and the chances of survival. Dr. Fox told him that the situation was grave and that Smart Score was down and could not get up. Dr. Fox recommended euthanasia. The evidence showed that Dr. Fox euthanized Smart Score on July 14, 2003, at about 11:15 a.m. Klopp also called Dr. Derwelis on July 14, 2003. Klopp testified that he asked Dr. Derwelis whether "the colitis that they were claiming if it was resulting from the surgery"; Dr. Derwelis responded, "[N]o." In his claim file activity record, Klopp referenced a July 14, 2003 phone conversation with Dr. Derwelis. However, in the claim file activity record, Klopp did not report that he had asked Dr.

Derwelis about whether the colitis was related to the surgery. Dr. Derwelis testified that he had no notation in his records that Klopp had contacted him in an attempt to determine whether or not the surgery caused the colitis but that it was possible that they had discussed it.

Klopp received a veterinarian's report, dated July 15, 2003, from Dr. Fox. In the report, Dr. Fox stated that he had diagnosed Smart Score with colitis and that he had euthanized Smart Score. Dr. Fox also reported that the sickness or injury first showed signs on July 14, 2003, and that the sickness or injury appeared to be entirely new. Dr. Fox also stated that Smart Score had undergone surgery about fourteen days prior to his July 14, 2003 illness.

Klopp received a call from Jerry Polk on August 5, 2003. Klopp noted in his claim file activity record that, during the call, Jerry Polk disputed that the $5,000.00 renewal policy applied to the claim and stated that "we should pay $40,000 under 30–day extension of coverage." Klopp also stated in the claim file activity record that, during the call, he told Jerry Polk that Smart Score's death was not covered under the thirty-day extension clause. On August 7, 2003, Jerry Polk left a message on Klopp's voice mail. According to Klopp's notes in his claim file activity record, Jerry Polk indicated that Dr. Fox would state that the colitis "was a result of surgery."

Klopp reported in the claim file activity record that he called Dr. Fox on August 7, 2003. According to Klopp's notes in the claim file activity record, Dr. Fox stated that the surgery "could have contributed" to the colitis but that Dr. Fox would not state that the surgery was "the cause" of the colitis. Klopp did not indicate in his claim file that he talked with any veterinarian about whether the surgery caused

the colitis until his August 7, 2003 telephone conference with Dr. Fox. Klopp testified about his discussions with Dr. Fox:

> The best Doctor Fox would ever tell me is that stress can be a cause of colitis. The horse may have been under stress and he may have, may have, developed colitis as a result of the stress, but he never would say that colitis was caused as a result of the surgery. It was always "may," "could have," "may have."

As stated above, Dr. Fox testified that, in his opinion, the surgery was a precipitating factor in Smart Score's colitis. Dr. Fox also testified that he had given this opinion to the insurance company and that "[he had] given the same opinion in—every time [he had] talked to anyone."

Klopp sent a letter dated August 25, 2003, to Polk and Moore's counsel stating that Smart Score's death fell within the renewal policy period (June 28, 2003, to June 28, 2004) and its limit of $5,000. On September 4, 2003, Polk and Moore's counsel sent a letter and submitted a proof of loss. Polk and Moore's counsel demanded payment of $40,000. In the proof of loss, Polk and Moore asserted that they were entitled to recover $40,000 for Smart Score's death under the thirty-day extension clause in the June 28, 2002 to June 28, 2003 policy. On September 5, 2003, Klopp sent a letter to Polk and Moore's counsel denying the $40,000 claim and offering $5,000 under the renewal policy. Klopp testified that he denied the claim "[b]ecause [he] had never been furnished with anything that would—that would say that this horse died as a result of the surgery."

Hannover contends in its brief that "Mr. Klopp's investigation and reliance upon two veterinarians who treated Smart Score who could not affirmatively link the surgery to the colitis was more than sufficient to allow him to rightfully deny the claim." Specifically, Hannover relies on Klopp's

testimony that, on July 14, 2003, he asked Dr. Derwelis about whether the colitis resulted from the surgery and that Dr. Derwelis responded, "No." However, Klopp did not state in his claim file activity record that he and Dr. Derwelis had discussed whether the colitis resulted from the surgery, and Dr. Derwelis could not recall whether such a conversation took place. Even though coverage under the thirty-day extension clause turned on the issue of whether Smart Score's colitis resulted from the surgery, nothing in Klopp's claim file indicated that he sought or obtained Dr. Derwelis's opinion on the issue before denying coverage under the extension clause. As the sole judge of the credibility of the witnesses, the trial court was free to disbelieve any or all of Klopp's testimony. *Cardwell v. Cardwell*, 195 S.W.3d 856, 859 (Tex.App.-Dallas 2006, no pet.). Therefore, the trial court could have concluded that Klopp did not seek or obtain Dr. Derwelis's opinion as to whether the colitis resulted from the surgery.

Klopp indicated in his claim file activity record that he called Dr. Fox on August 7, 2003. According to Klopp's notes in the claim file activity record, Dr. Fox stated that the surgery "could have contributed" to the colitis. Klopp also noted that Dr. Fox would not state that the surgery was "the cause." Klopp testified that Dr. Fox stated that the colitis "may have" or "could have" been caused by the surgery. Dr. Fox testified that colitis is a stress-related disease and that the stress associated with Smart Score's surgery was a precipitating factor in the colitis. He also testified that he had told the insurance company in a statement: "[O]ne of the things that had to be, in my opinion, a precipitating factor in a colitis would be the fact that the horse had arthroscopic surgery approximately ... 14 days prior to this incident." Dr. Fox also testified that he had given the same opinion every time. As the trier of

fact, the trial court was free to believe Dr. Fox's testimony and to disbelieve Klopp's testimony. *McGalliard*, 722 S.W.2d at 697. Thus, the trial court could have concluded that, during a telephone call on August 7, 2003, Dr. Fox told Klopp that Smart Score's surgery was a precipitating factor in the colitis.

■ Based on the evidence, the trial court could have concluded that Klopp denied Polk and Moore's claim without obtaining an opinion from Dr. Derwelis as to whether the colitis resulted from the surgery and with an opinion from Dr. Fox that the surgery was a precipitating factor in the colitis. Based on Hannover receiving Dr. Fox's opinion and not having an opinion to contradict it, the trial court could have concluded that Hannover's liability under the thirty-day extension clause had become reasonably clear. Under the above standards of review, the evidence is legally and factually sufficient to support the trial court's findings (1) that Hannover failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which its liability had become reasonably clear and (2) that Hannover refused to pay a claim without conducting a reasonable investigation with respect to the claim.

A plaintiff who proves a violation of Section 541.060 may recover "the amount of actual damages, plus court costs and reasonable and necessary attorney's fees." Section 541.152(a)(1). In *Vail v. Texas Farm Bureau Mutual Insurance Co.*, 754 S.W.2d 129 (Tex.1988), the insureds proved a cause of action under the DTPA by establishing that their insurer had engaged in an unfair settlement practice as that term was defined. *Id.* at 136. Former Article 21.21–2, section 2(d) provided that an insurer committed an unfair claims settlement practice by "[n]ot attempting in

good faith to effectuate prompt, fair, and equitable settlements of claims submitted in which liability has become reasonably clear." *Id.* at 133.

In *Vail*, the insurer argued that damages recoverable under an insurance policy represented breach of contract damages and did not constitute actual damages for the purposes of a claim for unfair claims settlement practices. However, the Texas Supreme Court held "that an insurer's unfair refusal to pay the insured's claim causes damages as a matter of law in at least the amount of the policy benefits wrongfully withheld." *Id.* at 136. Later, the Texas Supreme Court explained its holding in *Vail* by stating that "we held that policy benefits wrongfully withheld were indeed actual damages under the DTPA and Insurance Code." *Twin City Fire Ins. Co. v. Davis,* 904 S.W.2d 663, 666 (Tex.1995). Likewise, the policy benefits wrongfully withheld by Hannover constituted actual damages to Polk and Moore under the Texas Insurance Code. *See Vail,* 754 S.W.2d at 136. Therefore, Hannover's violations of the Insurance Code caused actual damages to Polk and Moore in the amount of $40,000.

Hannover attacks the legal and factual sufficiency of the evidence to support an award of additional damages under the Insurance Code. Section 541.152(b) of the Insurance Code provides that, "[o]n a finding by the trier of fact that the defendant knowingly committed the act complained of, the trier of fact may award an amount not to exceed three times the amount of actual damages." Section 541.002(1) of the Insurance Code defines "knowingly" as follows:

> "Knowingly" means actual awareness of the falsity, unfairness, or deceptiveness of the act or practice on which a claim for damages under Subchapter D is based. Actual awareness may be inferred if objective manifestations indicate that a person acted with actual awareness.

The Texas Supreme Court recently explained that, to support an award of extra-contractual damages under the Insurance Code, "there must be evidence that the insurer was actually aware that it was handling the claim in a way that was false, deceptive, or unfair." *Minn. Life Ins. Co. v. Vasquez,* 192 S.W.3d 774, 780 (Tex.2006). The trial court found that Hannover's conduct was committed knowingly.

Klopp's claim file activity report reflects that, during an August 5, 2003 telephone call with Jerry Polk, he denied that coverage existed under the thirty-day extension clause in the $40,000 policy. However, in the claim file, Klopp did not indicate that he talked with any veterinarian about whether the colitis resulted from the surgery until an August 7, 2003 telephone conference with Dr. Fox. Thus, the trial court could have concluded that Klopp denied the claim before conducting any investigation as to whether the colitis resulted from the surgery. Klopp denied the claim a second time on September 5, 2003. As stated above, the trial court could have concluded that Klopp denied the claim even though (1) Klopp knew of Dr. Fox's opinion that the surgery was a precipitating cause of the colitis and (2) Klopp had no contradictory opinion from another veterinarian. Based on the evidence, the trial court could have concluded that Hannover had actual awareness of the falsity, unfairness, or deceptiveness of (1) its failure to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which its liability had become reasonably clear and (2) its refusal to pay a claim without conducting a reasonable investigation with respect to the claim. Therefore, the evidence is legally and factually sufficient to support the trial

court's finding that Hannover knowingly violated the Insurance Code. We overrule Hannover's fourth issue.

■ Because the trial court found that Hannover knowingly violated the Insurance Code, Section 541.152(b) authorized the trial court to award "an amount not to exceed three times the amount of actual damages." The trial court awarded $40,000 in actual damages and $120,000 in additional damages. The trial court's total damages award of $160,000 under the Insurance Code quadrupled the amount of actual damages awarded. In its seventh issue, Hannover argues that the trial court erred in calculating the damages under Section 541.152(b). Hannover asserts that Section 541.152(b) limits the total damages recoverable to three times the actual damages and that, therefore, the trial court erred in quadrupling the actual damages in its award. The Texarkana Court of Appeals has held that Section 541.152(b) limits the total recovery to three times the amount of actual damages. *Allstate Indem. Co. v. Hyman*, No. 06–05–00064–CV, 2006 WL 694014, *10–12 (Tex.App.-Texarkana Mar.21, 2006, no pet.) (mem. op., not designated for publication). We agree with the reasoning of the Texarkana Court. Section 17.50(b)(1) of the DTPA is similar to Section 541.152(b) of the Insurance Code, and courts have interpreted Section 17.50(b)(1) as limiting a total recovery to three times the amount of actual damages. *See Fairmont Homes, Inc. v. Upchurch*, 711 S.W.2d 618, 619 (Tex.1986); *Jim Walter Homes, Inc. v. Valencia*, 690 S.W.2d 239, 241 (Tex.1985); *Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 584 (Tex.App.-Austin 2003, no pet.); *Busse v. Pac. Cattle Feeding Fund,*

896 S.W.2d 807, 818 (Tex.App.-Texarkana 1995, writ denied). We conclude that Section 541.152(b) limits the amount of total damages recoverable to three times the amount of actual damages.

The trial court erred in quadrupling the actual damages in its award. The trial court should have awarded total damages of $120,000 on Polk and Moore's Insurance Code claims. Therefore, we sustain Hannover's seventh issue. We modify the trial court's judgment by reducing the amount of additional damages awarded in Paragraph 2.b of the judgment from $120,000 to $80,000 and by reducing the sum awarded in Page 2 of the judgment from $221,808.95 to $181,808.95.

### *Hannover's Other Issues*

Based on our rulings on Hannover's first, second, and fourth issues, we need not address its fifth issue (that the trial court erred in finding that Hannover made a false, misleading, or deceptive representation to Polk and Moore, knowing or otherwise, relating to coverage under the policy) or its sixth issue (that the trial court's findings that Hannover improperly cancelled the renewal policy were irrelevant to the determination of the case). Tex.R.App. P. 47.1.

### *This Court's Ruling*

We modify the trial court's judgment and affirm the judgment as modified.