**Opinion issued June 13, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-01081-CV

———————————

## IN THE INTEREST OF D.K.J.J., D.K.D.J., D.D.J., JR., D.Q.D.J., D.K.J.J., AKA B.B.B., Minor Children

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2017-05317J

## MEMORANDUM OPINION

In this appeal, the mother and father of five minor children challenge the trial court's final decree terminating their parental rights based on findings that (a) they endangered the children, (b) they failed to comply with a provision of a court order specifying the actions necessary to obtain return of their children, and (c) termination of their parental rights was in the best interest of the children.

§ 161.001(b)(1)(D), (E), (o); *id.* § 161.001(b)(2). Both parents challenge the sufficiency of the evidence to support the predicate-act and best-interest findings. In addition, the mother asserts that the court erred by denying her request for a jury trial.

We affirm.

## Background

This case concerns five children whose ages at the time of trial were: Joseph and James, six years old (twins); Noah, almost five years old; Sarah, two-and-a-half years old; and Ben, one year old.[1] The father was 29 years old and the mother was 25 years old at the time of trial.

*Family history.* In 2015, before Sarah and Ben were born, the Department of Family and Protective Services was informed that the parents were using illegal drugs when the twins required emergency medical care. The mother testified that the boys had seizures, but the removal affidavit admitted at trial provided details of this prior intervention that suggest another cause. According to the affidavit, EMS was called when Joseph had difficulty breathing and coughed up blood. When the responders arrived, they found that the house had a "very heavy condensation of smoke" and "smelled of marijuana." They saw drug paraphernalia such as scales, pipes, and residue in the home. The mother's 16-year-old brother was present and

---

[1]    These are fictitious names, used to preserve the confidentiality of the children who are the subject of the suit and because of the similarity of the children's initials.

"was believed to have been smoking marijuana" because his eyes were "bloodshot and he appeared high." The father told the responders that he had put his finger in Joseph's throat to help him breathe, and he believed his son was coughing up blood due to a scratch. Joseph was taken by ambulance to a hospital. Shortly thereafter, James was also taken by ambulance to a hospital due to breathing difficulties.[2]

The removal affidavit also stated that during the prior investigation, both the mother and father admitted to daily drug use. Upon random drug testing, the father tested positive for marijuana, hydrocodone, and opiates, and the mother tested positive for marijuana. The twins and Noah were placed with the mother's cousin, and the mother's brother moved out. The Department ruled that there was "reason to believe" the allegation of neglectful supervision, but after the parents participated in services required by the Department, the children were returned to them.

*The removal.* In October 2017, while in the hospital for Ben's birth, the mother tested positive for opiates and benzodiazepines. Ben, however, tested negative when screened for drugs. Because he was premature, he was treated for respiratory distress in the Neonatal Intensive Care Unit. The Department asked the parents to submit to voluntary drug testing, and they refused. The father informed

---

[2]    At the trial in this case, the mother said that the twins needed emergency care because they suffer from seizures. There is no mention of either child having a seizure disorder in any other part of the appellate record.

3

the caseworker that they would not submit to drug tests without a court order. He also told the caseworker that the mother tested positive for opiates and benzodiazepines due to medication administered by the hospital. The hospital told the caseworker that the mother's drug test was done before the hospital treated her.

The caseworker continued to follow up with the family over the next 17 days. She wanted to see the older children, and while the father initially agreed to meet her, he later cancelled. The mother agreed to allow the caseworker to come to her apartment, but when the caseworker arrived, the mother was not there and the apartment complex leasing office told her that the mother had not lived there for more than a year. The mother later told the caseworker that her mother-in-law, who was caring for the children while she gave birth to Ben, lived in the apartment complex. The mother asked to meet in a grocery store parking lot. After waiting in the grocery store parking lot, the caseworker called the mother, who said she was at the apartment complex. The mother later brought the children to a gas station parking lot, where the caseworker saw them but was not permitted to speak to them.

The day after the caseworker saw the older children, she learned that there was a warrant for the arrest of the father, who had failed to appear in court on a charge of possession of a controlled substance. All the children were removed from

the parents' care: the twins were placed in one foster home, and the three younger children were placed together in a different foster home.

*Attempts at reunification.* The court entered orders establishing the actions necessary for the parents to obtain the return of their children. Both parents were ordered to "remain drug free," and "maintain negative drug tests throughout the life of the case." They were ordered to submit to random drug testing, and they were informed that refusal to submit to a drug test would be considered a positive result. They were ordered to attend all hearings and family visitations; to participate in psychological assessment and counseling; to participate in substance abuse assessment and counseling; and to attend parenting classes. The parents were ordered to "secure legal and appropriate employment" no less than six months before the conclusion of the case and to provide the Department with "proof of employment in the form of check stubs, bank statements, direct deposit statements, etc."

The parents attended and participated in assessments, counseling, parenting classes, and hearings, but both parents failed to appear at a hearing in August 2018, approximately three weeks after they tested positive for drug use. Both parents testified at trial that they were working, but the father did not provide the Department with proof of employment before trial. The parents also initially participated in visitation, but the father's repeated and emotionally charged

5

outbursts during visitation caused the Department to conclude that it could no longer "appropriately supervise" visits, even with a monitor and security guards present. In early May 2018, family visits were suspended until the parents could address issues of substance abuse and behavior.

*Drug test results.* Both parents submitted to some, but not all, of the court-ordered drug tests, and both had results that indicated that they continued to use controlled substances. Based on hair samples, the mother tested positive for cocaine metabolites, marijuana metabolites, and marijuana in November 2017, and she tested positive for cocaine metabolites and marijuana metabolites in April 2018 and August 2018. The mother twice—January 2018 and May 2018—failed to provide samples for court-ordered tests for a zero-tolerance hair analysis, a urine drug screen, an alcohol screen, and screenings for synthetic marijuana and cocaine.

Bruce Jefferies, who works for the National Screening Center, National Assessment Center, testified at trial as an expert in drug testing as stipulated by the parties. He interpreted the parents' drug test results. The mother's test results included a positive urine test result from April 2015, which, Jefferies explained, was at a level that indicated the mother had used marijuana "for the last 30 days on a consistent basis," i.e., daily. The children were reunited with the parents after that removal, and the mother's next chronological drug test result was in November 2017, when she tested positive for ingestion of both marijuana and cocaine at low

levels. Jefferies said that the levels found indicated occasional ingestion of those drugs over the prior 90 days.

In January 2018, the mother's urine drug test was negative for everything tested, but the hair analysis indicated that she was often around others who were "constantly" smoking marijuana. In April, the drug tests indicated that the mother had ingested cocaine and marijuana, probably two days in a row, and the result could not have been caused by the same instances of drug use that were detected in the mother's November 2017 test results. In May, the mother failed to appear for testing, and in August 2018, the mother again tested positive for ingestion of cocaine. The level detected indicated that this was a use of cocaine that occurred after April 2018. There was also evidence that the mother had been exposed to marijuana, though it was not clear whether she had also ingested it.

The father also had some positive test results and failed to appear for two court-ordered tests. Based on a hair sample, the father tested positive for marijuana and cocaine metabolites in April 2018. In August, he tested positive for marijuana and marijuana metabolites, cocaine metabolites, opiates, and benzodiazepine (specifically, clonazepam metabolites). In December 2017 and May 2018, the father failed to provide samples for a zero-tolerance hair analysis, urine drug screen, alcohol screen, and screenings for synthetic marijuana and cocaine.

At trial the father testified that he had been taking amoxicillin, oxycodone, Soma (a prescription muscle relaxant), ibuprofen, and a laxative. He said that these medications were prescribed to him, and he introduced into evidence prescriptions from December 2017 for oxycodone (which was dispensed as 120 30-milligram pills), carisoprodol (Soma), stool softener, and biofreeze menthol gel. He introduced pharmacy records that showed he refilled his oxycodone and carisoprodol in January, February, and early April 2018. He also introduced records showing that he filled prescriptions for alprazolam (a benzodiazepine) six times between September 2015 and September 2016; each prescription was for 90 two-milligram pills. Similarly, he filled prescriptions for carisoprodol three times between April and June 2016; each prescription was for 120 350-milligram pills. The father denied that the medication he took affected his parenting or driving ability. And he asserted that the positive test results for cocaine were false positives caused by the prescribed medications he was taking.

Jefferies also discussed the father's drug tests. The father failed to appear for court-ordered testing in December 2017, but in April 2018, his test results indicated ingestion of cocaine and exposure to marijuana. The level of cocaine was low, but it indicated more than one use of the drug. The father again failed to comply with court-ordered testing in May, but tests in August indicated that the father had used drugs since the April test was conducted. The father's August test

8

results were positive for cocaine, morphine, codeine, and marijuana. Jefferies testified that the level of cocaine found indicated more than one use. The level of marijuana indicated "heavy use," or "smoking every day." Jefferies testified that the prescription medications that the father used "would never show positive for cocaine." He also testified that he saw results indicating the presence of a benzodiazepine for which there was not a prescription provided.

The Department sought termination of the parents' rights, and the court set the case for final trial on October 30, 2018. On October 1, 2018, both parents, individually, filed jury demands, and each paid the jury fee. The trial court denied the request for a jury.

***Testimony and evidence adduced at termination trial.*** At trial, the mother testified that she previously had a problem with marijuana, but she denied having used marijuana since 2015. She testified that she had been living with her mother, who smoked marijuana, when her test results showed that she had been around people using marijuana. The mother denied ever having used cocaine. She asserted that she tested positive for drugs when Ben was born because she had taken a prescription medication, however no such prescription was admitted at trial.

The mother declared that she did everything the Department required of her, and she denied having ever put her children in jeopardy. She testified that she was employed as a caregiver at a home for special needs adults. Before trial, she

provided the Department with pay stubs from that job. She said she had obtained housing by first living with her mother and then living with the father, with whom she had an eight-year relationship. She testified that she reconnected with the father because she believed it was "better for us to fight for our children together." The mother denied the accuracy of the father's drug test results.

The father testified that he was employed six days a week doing air conditioning and electrical work for Geneva Air. He maintained that he was paid in cash, and he introduced a letter from his employer, which stated that he was employed as an independent contractor and held a position as a service technician. The letter stated that the father was paid $25 per hour. The father testified that he helped the mother with the children by providing them a home and "everything that they needed," such as food and clothes.

The father introduced his lease into evidence along with copies of cashier's checks made to the landlord identified on the lease. The lease listed only the father as a tenant, and it listed the "only persons" he could "permit to reside on the Property during the term of this lease" as Joseph and James. The mother was mentioned in the lease as a person who could access the property in the event the father died. The term of the lease was September 15, 2017 to September 30, 2019.

The father testified that the house he was living in was safe and set up for his children, but the Department never came to see it. He praised the mother and said

that, before their removal, the twins were in school, and he had been working with the school to arrange speech therapy. He attributed their speech delay to the fact that he was teaching them Spanish, although he conceded he was not fluent in Spanish.

The father said that his work often exacerbated pain that was caused by prior injuries and for which he used prescription medicine as needed, specifically oxycodone. He admitted that he had several prior convictions for possession of marijuana, but he asserted that he stopped using marijuana after the first time the children were removed in 2015, and he began smoking marijuana again, in Texas, when he learned that marijuana had been "decriminalized."[3] The father denied having ever used cocaine. He maintained that his prescribed medications caused a false positive test result for cocaine.

***The parents' arrests.*** Both parents were arrested during the pendency of the litigation. The mother was arrested for theft in Brazoria County. She was also arrested in Harris County for possession of a controlled substance, oxycodone, and for failing to stop and give information after a car accident. The mother testified that she had been driving the father's car and that the pills found in the car belonged to him. She also said that she believed the charges would be dismissed.

---

[3]     Marijuana has not been decriminalized in Texas. *See* TEX. HEALTH & SAFETY CODE §§ 481.120 (Offense: Delivery of Marihuana), 481.121 (Offense: Possession of Marihuana).

No evidence corroborating this testimony is in the record, but at one point during the mother's testimony, her attorney advised her not to answer any more questions because criminal charges were pending. The father was also arrested in Brazoria County in July 2018, for possession of a controlled substance and theft. The father told the Department caseworker, P. Boatner, that the charges were rejected or dismissed and there was no longer a case pending against him.

*Issues and concerns about the children.* The permanency report, which was filed in October 2018 and admitted into evidence at trial, provides additional information about the children's well-being.

**Joseph and James.** Both Joseph and James were described as a "happy" six-year olds who love "watching cartoons and playing with [their] siblings." Their mental health assessments noted concerns about their academic progress and readiness, possible need for additional instruction in early literacy and math, possible need for evaluation for dyslexia, and need for intervention with a speech-language pathologist. The licensed psychologist who evaluated them recommended that they have "as much daily routine and predictability as practicable at home," along with "positive reinforcement" for completing homework, doing chores, and being cooperative. He also recommended that that both Joseph and James work with the school's guidance counselor to "increase the safety net of social-emotional support."

**Noah.** Noah was evaluated by a psychologist who has certification as a licensed specialist in school psychology. He described Noah as a "happy" four-year-old "who loves building things with his toys and playing with his siblings." Noah participates in gymnastics and piano lessons, and he is engaged in biweekly therapy. Noah was diagnosed with global developmental delay, severe attention deficit hyperactivity disorder ("ADHD"), and disruptive mood dysregulation disorder. He was also diagnosed with neglect based on history. The recommendations for Noah included "an educational environment which could provide a low teacher to student ratio and possible access to outside educational resources." The psychologist recommended other interventions such as incentives for effort and success, psychiatric support, close monitoring in "high stimulus and loosely structured settings," and possibly a preschool program for children with disabilities.

The psychologist noted other concerns about Noah, saying: "His needs appear outside of normal limits and do not appear primarily related exclusively to his learning issues." The psychologist indicated that Noah may need modified support, continued psychiatric consultation, and medication due to issues with mood regulation and aggression, "which may amplify with time." While the permanency report noted that Noah was being treated with guanfacine and methylin for his ADHD, and the psychologist stressed Noah's need for "continuity

and predictability in his environment," stating that he will be "a challenge to parent on a regular basis." Finally, the psychologist recommended consideration of occupational and speech therapy and another evaluation in a year.

**Sarah.** Sarah was described as a "happy two-year-old who enjoys being held, playing with her siblings and playing with toys." She participated in gymnastics. Her only diagnosis was "neglect of a child, confirmed." The counselor who evaluated her recommended that she "reside in a family home environment that is nurturing, safe and predictable," and she stated that Sarah was "functioning very well in her current placement with foster parents." It was also recommended that she "maintain placement with siblings." No specific educational or developmental needs were identified, and the foster parents were encouraged to continue engaging Sarah and encouraging age-appropriate development.

**Ben.** Ben was described as a "happy" eleven-month-old who enjoys being held, talked to, roll[ing] around and play[ing] with toys." Ben had previously failed a hearing and vision screening, and follow-up care with a physician was recommended. Ben used albuterol to reduce wheezing. No concerns or special needs were noted about him.

***The children's progress in foster care.*** Boatner testified that the children were well adjusted in their placements. Noah was diagnosed with ADHD, and he had been engaged in therapy sessions with a behavioral therapist and

extracurricular activities. He also took medication because the behavioral modifications were insufficient to correct problematic behavior like hitting other children in the home and having tantrums. Noah was comfortable and safe in his placement and well bonded to his siblings. Moore expressed a concern that the twins may have some educational or developmental delay relating to speech and penmanship, however, Boatner testified that the foster placements were meeting the physical and emotional needs of the children.

*The Department and Child Advocates recommendations.* Boatner testified on behalf of the Department, and she said that neither parent fully completed the family service plan. Specifically, they failed to complete the substance abuse programs by attending either Alcoholics Anonymous or Narcotics Anonymous meetings. In addition, the father did not provide documentation of employment or a copy of his lease to the Department as required in the family service plan. The mother provided one pay stub to the Department, but she did not provide such information to Boatner. She also did not provide any proof of having secured safe and stable housing.

The Department recommended termination based on the parents' continued drug use, as evidenced by the drug tests and their recent arrests. When questioned by the attorney ad litem, Boatner agreed that the parents failed to meet the goals established by the family service plan including: (1) providing a safe and stable

environment for the children to mitigate the circumstances that brought them into custody; (2) demonstrating an ability to provide basic necessities such as food, clothing, shelter, medical care, and supervision; (3) learning to provide for the needs of the children; (4) demonstrating an ability to protect them from future neglect; (5) demonstrating an acceptance of the responsibility of parenting; and (6) demonstrating a willingness and ability to protect her children from people who may inflict serious harm or neglect.

Boatner also agreed that the parents' refusal to accept responsibility for their failure to protect their children was itself endangering. The Child Advocate, G. Moore, testified that he was concerned about the parents' continuing drug problems, specifically their inability to remain drug free and to acknowledge that their drug use is problematic. Both Boatner and Moore testified that termination of the parents' rights was in the best interest of the children.

***The foster parents' desire to adopt all five children.*** The foster parents of the three younger children wanted to adopt all five of them together, and both Boatner and Moore were confident in their ability to raise all five children together with their three biological children. The foster parents of the younger siblings lived in a home with six bedrooms and four bathrooms on a one-half acre lot. Both Boatner and Moore testified that the foster parents had space for all the children. Child Advocate Moore said that his focus was on keeping the siblings together.

16

Based on his regular visits with the children, Moore testified that the younger siblings wanted the twins to live with them. Moore said: "We believe they have not only the financial capacity and the house capacity but the hearts and the love to adopt this entire family."

The foster mother, who is a former teacher and now a stay-at-home mother, testified that she wants to adopt all five children "with all my heart." By the time of trial, Ben had been with them almost a year, and Noah and Sarah had been with them for seven months. The foster mother testified that she had come to know the twins "very well" by spending time with them when they visited their siblings at the foster parents' home.

The foster parents have been working to obtain approval to take in all five children. In addition to the five children they wish to adopt, they also have three biological children, aged seven, eight, and nine. One has cerebral palsy due to a birth injury. The family has "full time nursing six days out of the week to assist with him." The mother said they planned to ensure at least two adults are in the home when all eight children are there. She also said that they had hired someone to stay awake in the home at night to help with the children.

***Final judgment.*** The trial court entered a final judgment terminating the parents' rights based on endangerment, *see* TEX. FAM. CODE § 161.001(b)(1)(D), (E), and based on failure to "comply with the provisions of a court order that

17

specifically established the actions necessary . . . to obtain return of the children." *See id.* § 161.001(b)(1)(O). The trial court found that neither parent proved by a preponderance of the evidence that he or she was unable to comply with specific provisions of the court order or that he or she made a good faith effort to comply with the order and the failure to comply was not due to any fault of the parent. *See id.* § 161.001(d). The court also found that termination of each parent's rights was in the children's best interest. *See id.* § 161.001(b)(2).

## Analysis

On appeal, both parents challenge the sufficiency of the evidence to support the trial court's predicate-act and best-interest findings. The mother also challenges the trial court's denial of her request for a jury trial.

## I.     Sufficiency of the evidence

### A.     Standards of review

The interest of parents in the care, custody, and control of their children is a fundamental liberty interest protected by the Constitution. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982). But the rights of natural parents are not absolute. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Protection of the child is paramount, and when the State institutes proceedings to terminate parental rights, the courts focus on protecting the best interests of the child. *See id.*

18

"A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 618 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We strictly scrutinize termination proceedings on appeal because "the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Santosky*, 455 U.S. at 747–48); *see In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

In conducting a legal sufficiency review, we view "the evidence in the light most favorable to the judgment," which means that we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. A reviewing court may not disregard undisputed facts that do not support the finding, but it "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* Evidence is legally sufficient when it enables a factfinder to "reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof." *Id.* at 265–66; *see* TEX. FAM. CODE § 101.007.

In a factual sufficiency review, the reviewing court again determines "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *J.F.C.*, 96 S.W.3d at 266 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). But rather than disregarding disputed evidence that the factfinder could have disbelieved, we consider whether "a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*; *see In re A.R.R.*, No. 01-18-00043-CV, 2018 WL 3233334, at *3–4 (Tex. App.—Houston [1st Dist.] July 3, 2018, pet. denied) (mem. op.).

A court may order termination of the parent-child relationship when it finds by clear and convincing evidence that the parent has committed one or more of the statutorily enumerated predicate acts or omissions, and that termination is in the children's best interests. TEX. FAM. CODE § 161.001(b)(1), (2). "Only one predicate finding" under Section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *A.V.*, 113 S.W.3d at 362; *see In re A.H.L.*, No. 01-16-00784-CV, 2017

20

WL 1149222, at *3 (Tex. App.—Houston [1st Dist.] Mar. 28, 2017, pet. denied) (mem. op.).

Section 161.001(b)(1)(M) permits the trial court to terminate a parent-child relationship when it finds that the parent has previously had his or her parent-child relationship terminated with respect to another child based on a finding that the parent endangered the child in violation of section 161.001(b)(1)(D) or (E). TEX. FAM. CODE § 161.001(b)(1)(M). Because of the consequences attached to an endangerment finding under section 161.001(b)(1)(D) or (E), when a parent raises a challenge to a finding that he or she endangered a child in violation of section 161.001(D) or (E), due process and due course of law require the appellate court to review those findings even when another predicate act is supported by sufficient evidence or unchallenged. *In re N.G.*, No. 18-0508, 2019 WL 2147263, at *3 (Tex. May 17, 2019) (per curiam); *In re Z.M.M.*, No. 18-0734, 2019 WL 2147266, at *1 (Tex. May 17, 2019) (per curiam). The Supreme Court has previously held that a court of appeals must detail the relevant evidence when reversing a termination decree for insufficient evidence, but it was not required to provide the detailed analysis when it affirmed a termination after determining that the evidence is sufficient. *See N.G.*, 2019 WL 2147263, at *4 (citing *In re A.B.*, 437 S.W.3d 498, 504–05 (Tex. 2014)). But the same due process and due course of law concerns that require a court of appeals to review a challenge to a (D) or (E) finding also

21

require the court to provide a detailed analysis of the relevant evidence relied upon to conclude whether the evidence is sufficient. *See id.*

The "best interest" finding is a separate inquiry from the finding of a predicate act, but evidence that supports a predicate-act finding may also be probative of the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(2); *A.R.R.*, 2018 WL 3233334, at *4. "A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship." *A.H.L.*, 2017 WL 1149222, at *4. Our review of a trial court's best interest finding is guided by the following non-exclusive factors: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *A.R.R.*, 2018 WL 3233334, at *4.

**B.** **The evidence was legally and factually sufficient to show that both the mother and father endangered the children under (D) and (E).**

Both parents have challenged the trial court's findings that each of them endangered their children under section 161.001(b)(1)(D) and (E).

Section 161.001(1)(D) provides that a court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Section 161.001(1)(E) provides that a court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well being of the child." *Id.* § 161.001(b)(1)(E).

The word "endanger" as used in section 161.001 "means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). In this context, endanger means to expose to loss or injury or to jeopardize. *Id.*; *see Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (internal quotation omitted) (endangerment includes jeopardizing a child's emotional or physical health); *accord In re A.J.H.*, No. 01-

23

18-00245-CV, 2019 WL 190050, at *7–8 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.).

Endangerment under subsection (D) arises from a child's environment and a parent's disregard for the potential for danger created by the environment. *A.J.H.*, 2019 WL 190050, at *7; *Jordan*, 325 S.W.3d at 721. Although "the focus of subsection (D) is on the child's living environment and not on the parent's conduct, parental conduct may produce an endangering environment." *In re M.T.W.*, No. 01-11-00162-CV, 2011 WL 6938542, at *12 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.) (citing *Jordan*, 325 S.W.3d at 721). For example, abusive or violent conduct or illegal drug use by a parent or other resident of the child's home may produce an endangering environment. *Id.* Endangerment under subsection (E) arises when a parent's course of conduct jeopardizes the child's emotional or physical health. *See A.J.H.*, 2019 WL 190050, at *7. This course of conduct includes acts, omissions, and failures to act, but it "must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent." *M.T.W.*, 2011 WL 6938542, at *12 (citing *Jordan*, 325 S.W.3d at 723). Because the evidence concerning these two statutory grounds for termination is often interrelated, we may consolidate our examination of the evidence to support both grounds. *See A.J.H.*, 2019 WL 190050, at *8.

**1.    The mother endangered her children by allowing them to live in an environment where adults used illegal drugs and by engaging in conduct, including the use of illegal drugs, that jeopardized their physical and emotional well-being.**

Although the children were removed from the parents in 2017, the evidence in this case begins in April 2015. At that time, the three oldest children were removed from the parents' care after emergency medical services were required when the twins suffered respiratory distress. The responders noted that the house was full of "heavy marijuana smoke." Both parents admitted using illegal drugs, including marijuana, on a daily basis, and there was evidence that the mother's 16-year-old brother was also living in the home and using marijuana there. The mother testified that her use of marijuana was unrelated to the children's need for emergency medical care because they suffered from seizures. However, the factfinder could have disbelieved her testimony because a year's worth of evaluations of the children and multiple permanency hearings resulted in no indication that any of the children had any type of seizure disorder. A reasonable factfinder could have concluded that in 2015 the mother's use of marijuana placed her three eldest children in an endangering environment.

The mother's drug use is also some evidence that she engaged in conduct that endangered her children's emotional or physical well-being. Illegal drug use may support termination under section 161.001(b)(1)(E) because "it exposes the

child to the possibility that the parent may be impaired or imprisoned."[4] *Walker*, 312 S.W.3d at 617; *see In re E.V.V.M.-H.*, No. 01-18-00888-CV, 2019 WL 1388029, at *5 (Tex. App.—Houston [1st Dist.] Mar. 28, 2019, no pet.) (mem. op.). This creates a risk of uncertainty and instability, and "[a]s a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *N.A.B. v. Tex. Dep't of Family & Protective Servs.*, No. 03-14-00377-CV, 2014 WL 6845179, at *2 (Tex. App.— Austin Nov. 26, 2014, no pet.) (mem. op.).

Jefferies testified that the mother's drug test results from April 2015 indicated that she had been using marijuana daily. In 2017, a drug test was conducted when the mother entered the hospital to give birth to Ben. It indicated that she had used opiates and benzodiazepines while pregnant with Ben. During the pendency of this case, the mother twice refused to submit to drug testing, in January and May 2018. She tested positive for the use of marijuana and cocaine twice, in November 2017 and April 2018, and for cocaine in August 2018. According to Jefferies, who testified as an expert and interpreted the drug test results, the results from November 2017 and April 2018 indicated occasional use of illegal drugs, and the result from August 2018 indicated a use of drugs that occurred after April 2018. According to Jefferies, drug tests from January 2018

---

[4] The mother's drug test results did not indicate heavy daily use of illegal drugs. Texas law does not provide a safe haven for the occasional use of illegal drugs.

indicated that the mother was around people who were "constantly" smoking marijuana.

The mother minimized and disputed the drug test results. She said that she was living with her mother, who smoked marijuana, when the test indicated that she was around people constantly smoking marijuana. She also said that the drug test from Ben's birth was a result of her use of prescribed medication, but no evidence corroborated her assertion that she had used prescribed drugs. The mother also denied having ever used cocaine as well as using marijuana any time after the 2015 case. But the factfinder is the sole arbiter of the credibility and demeanor of the witnesses, and it is free to disregard evidence that it finds incredible. *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006); *see In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *15 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.) ("As the trier of fact, the trial court was not required to accept the mother's testimony regarding her drug use and could have resolved any disputed evidence against her."). In light of the drug test results and Jefferies' explanation of them, a reasonable factfinder could have disregarded the mother's testimony that she used only prescribed medication and her denials of having used cocaine and marijuana.

"[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336,

27

345 (Tex. 2009). A parent's drug use is indicative of instability in the home because it exposes the children to the possibility that the parent may be impaired or imprisoned. *See In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Evidence of a parent's past pattern of drug use is relevant to present and future stability, especially regarding the parent's ability to provide for the children and protect them from emotional and physical danger. *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.). "A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *A.M.*, 495 S.W.3d at 580 (quoting *In re K.C.F.*, No. 01–13–01078–CV, 2014 WL 2538624, at *9–10 (Tex. App. Houston [1st Dist.] 2014, no pet.) (mem. op.)); *see also In re S.G.*, No. 01-18-00728-CV, 2019 WL 1448870, at *5 (Tex. App.—Houston [1st Dist.] Apr. 2, 2019, no pet. h.) (mem. op.) ("Parental drug abuse also reflects poor judgment and an unwillingness to prioritize a child's safety and welfare and thus may be considered in determining a child's best interest.").

The evidence in this case demonstrates the mother's historical and continuing use of drugs despite actual and threatened consequences to her children. The drug tests indicated that the mother repeatedly used illegal drugs during the pendency of this case. For example, Jefferies testified that the August 2018 test

detected use of marijuana and cocaine that occurred after April 2018. In addition to testing positive for drug use, the mother twice failed to submit to a court-ordered drug test despite knowing that doing so would result in a deemed positive result. This is evidence that the mother acted with disregard for the risk of harm to her children by jeopardizing her relationship with them.

The mother's use of illegal drugs has already produced instability and uncertainty in her children's lives. Joseph, James, and Noah have been removed from their mother's care twice in three years due to her use of illegal drugs. This has resulted in the children living in multiple homes in their brief lives. Sarah was two years old at the time of trial, and she had already lived in three different homes. Ben never went home with his mother, and he only had visitation with her for part of his first year of life. Visitation was cancelled after the father acted out, and the mother's ability to visit her children was made contingent upon a clean drug test, which she did not obtain. Thus, the mother's use of drugs has significantly deprived her children of her time, attention, and care. These repeated separations from her children interfered with her ability to parent them.

A parent's endangering conduct need not occur in the child's presence or even before the child's removal. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Walker*, 312 S.W.3d at 617. This can include conduct directed toward older children as well as conduct during the parent's

pregnancy, such as knowingly using illegal drugs while pregnant. *See J.O.A.*, 283 S.W.3d at 345; *E.V.V.M.-H.*, 2019 WL 1388029, at \*5; *Jordan*, 325 S.W.3d at 724. (evidence regarding a parent's treatment of another child is relevant). The evidence showed that the mother used illegal drugs in the home with Joseph, James, and Noah before Sarah and Ben were born. It also showed that the mother tested positive for opiates and benzodiazepines just prior to giving birth to Ben. A reasonable factfinder could conclude that she used opiates and benzodiazepines during her pregnancy with Ben.

In addition to the evidence relating to the mother's use of illegal drugs, evidence of other endangering behaviors was adduced at trial. For example, the mother was arrested for possession of a controlled substance during the pendency of this case. That criminal case was pending when the trial in this case occurred. The mother and father both contend that she was driving his car when she was involved in a collision. They both said that the drugs found in the glove compartment were the father's prescription drugs. The mother testified that the case was going to be dismissed. Just as the factfinder was not required to credit the mother's denials of drug use, the factfinder was also not required to credit the testimony that the criminal charges would be dropped. *See H.R.M.*, 209 S.W.3d at 109; *H.M.O.L.*, 2018 WL 1659981, at \*15.

Finally, the mother not only denied her own use of cocaine, she asserted that the father had never done cocaine and that his drug test results were erroneous. She testified that she knew that the father continued to use marijuana after the 2015 case, when they remained together and had two additional children. A reasonable factfinder could conclude that the mother knowingly allowed her children to remain around a person using illegal drugs.

\* \* \*

Considering the evidence "in the light most favorable to the judgment," and disregarding "all evidence that a reasonable factfinder could have disbelieved or found incredible," we conclude that the evidence would enable a factfinder to "reasonably form a firm belief or conviction" that the mother knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered their physical or emotional well-being and that she engaged in conduct that endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). We hold that the evidence is legally sufficient to support the trial court's findings under subsections (D) and (E).

In reviewing the evidence as to the mother under our factual sufficiency standard of review, we observe that the evidence that a reasonable factfinder could not have resolved in favor of its finding is limited to witness testimony, primarily the mother's testimony. As we have explained, this disputed evidence was subject

to the factfinder's assessment of credibility. In light of the entire record, we conclude that the disputed evidence that could not be credited in favor of the endangerment predicate-act findings is not so significant that the trial court as factfinder could not reasonably have formed a firm belief or conviction that the mother endangered her children as defined by the statute. *See J.F.C.*, 96 S.W.3d at 266. We hold that the evidence is factually sufficient to support the trial court's findings, and we overrule the mother's first two issues.

> **2.** **The father endangered his children by allowing them to live in an environment where adults used illegal drugs and by engaging in conduct, including the use of illegal drugs that jeopardized their physical and emotional well-being.**

As we did when considering the sufficiency of the evidence to support the trial court's findings as to the mother, we consider the evidence of the removal of Joseph, James, and Noah in April 2015. For the same reasons that we concluded a reasonable factfinder could find that the mother's use of illegal drugs placed the three eldest children in an endangering environment in April 2015, we conclude that the father's use of illegal drugs did so as well.

The father's drug use is also some evidence that he engaged in conduct that endangered his children's emotional or physical well-being. The father tested positive for marijuana and cocaine in April 2018, at a level that Jefferies testified represented more than a one-time use. In August 2018, he tested positive for marijuana, cocaine, opiates, and benzodiazepines. Jefferies testified that the results

indicated more than a single use of all of the drugs, and heavy daily use of marijuana. The father also failed to appear for tests in December 2017 and May 2018, shortly after the court suspended visitation pending a clean drug test. These resulted in deemed positive results.

The father denied using cocaine, testified that he only began smoking marijuana again after it was decriminalized, and asserted that the positive drug tests were false positives based on the prescribed medications he was taking. But Jefferies testified that it was not possible for the prescription medications to cause a false positive for cocaine. We must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *A.B.*, 437 S.W.3d at 503. The trial court was not required to believe the father's testimony that he did not use cocaine, nor was it required to accept the father's "false positive" explanation that was refuted by Jefferies, or to accept the father's incorrect statement that marijuana has been decriminalized.

The father's use of illegal drugs, as well as other conduct, has already produced instability and uncertainty in his children's lives. Joseph, James, and Noah have been removed from their father's care twice in three years due, in part, to his use of illegal drugs. In addition, the father had several prior convictions for possession of marijuana and possession of controlled substance. When Ben was

born, there was a warrant out for the father's arrest for failing to appear in court on a charge of possession of a controlled substance. Visitation was suspended after the father's emotional and aggressive outbursts in front of his children prompted the Department to conclude that it could no longer safely supervise family visitation. The court informed the parents that visitation could be resumed when the parents demonstrated sobriety by clean drug tests, but the father did not test negative for drug use.

In addition to the evidence relating to the father's use of illegal drugs, evidence of other endangering behaviors was adduced at trial. For example, the father had multiple prior convictions for possession of a controlled substance, and arrests on other charges that ultimately were dismissed. He was arrested for theft, and the criminal case was pending when the trial in this case occurred. The factfinder could reasonably infer that the father placed himself in situations in which he risked further separation from her children and possible imprisonment. *See In re T.G.R.–M.*, 404 S.W.3d 7, 14–15 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

As we concluded with regard to the mother, the father's conduct has significantly deprived his children of his time, attention, and care. The repeated separations from his children interfered with his ability to parent them, and other

conduct has created a risk of more separation should the children be reunited with him. *See J.O.A.*, 283 S.W.3d at 345.

* * *

Considering the evidence "in the light most favorable to the judgment," and disregarding "all evidence that a reasonable factfinder could have disbelieved or found incredible," we conclude that the evidence would enable a factfinder to "reasonably form a firm belief or conviction" that the father knowingly placed or knowingly allowed his children to remain in conditions or surroundings which endangered their physical or emotional well-being and that he engaged in conduct that endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). We hold that the evidence is legally sufficient to support the trial court's findings under subsections (D) and (E).

We hold that the evidence is factually sufficient to support the trial court's findings, and we overrule the mother's first two issues.

In reviewing the evidence as to the father under our factual sufficiency standard of review, we observe that the evidence that a reasonable factfinder could not have resolved in favor of its finding consists of the testimony of the parents denying drug use and other endangering behavior, and the documentary evidence the father introduced at trial. The disputed testimony was subject to the factfinder's assessment of credibility. And the father's documentary evidence did not refute the

evidence of his pattern of using marijuana and cocaine and the consequences that flowed therefrom. Other documents did not prove that he complied with other provisions of the family service plan. For example, the letter from the father's employer did not indicate how long he had held that job.

Because the father's documentary evidence did not substantively refute the evidence in favor of the endangerment findings and the testimony was subject to the trial court's credibility assessment,[5] in light of the entire record, we conclude that the disputed evidence that could not be credited in favor of the endangerment predicate-act findings is not so significant that the trial court as factfinder could not reasonably have formed a firm belief or conviction that the father endangered his children as defined by the statute. *See J.F.C.*, 96 S.W.3d at 266.

---

[5] There are multiple inconsistencies in the father's testimony and evidence, all of which would inform a factfinder's credibility determination. For example, the father testified that he worked six days a week for Geneva Air, and that he had done so for three years without time off or vacation. However, he later testified that he had taken time off to address his family's situation. The father testified that the cocaine results were false positives caused by his use of amoxicillin, which he said was the "only" prescription medication he used. Later he testified that he used prescribed oxycodone and carisoprodol on a regular basis because his work routinely caused him pain. The father testified that he had been teaching his children Spanish to ensure that they had many opportunities in their future. But he also testified that he was not fluent in Spanish, and the child advocate testified that the children had no knowledge of Spanish. Lastly, the father testified that he provided the mother and the children a place to live and all necessities. But the lease he offered as proof, the term of which began a month before Ben was born, did not include the mother or children as tenants, and it listed only Joseph and James as other people entitled to live with him in the house.

We hold that the evidence was factually sufficient to support the trial court's findings, and we overrule the father's first issue.

## C. The evidence was legally and factually sufficient to show that both the mother and the father failed to comply with a provision of a court order.

### 1. The mother failed to comply with her family service plan.

The trial court found that the mother "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department" for at least nine months "as a result of the child's removal from the parent . . . for the abuse or neglect of the child." TEX. FAM. CODE § 161.001(b)(1)(O). The mother's family service plan was "a court order that specifically established the actions necessary" for her to obtain the return of her children. *See id.* "Section 161.001(b)(1)(O) makes clear that an order must be sufficiently specific to warrant termination of parental rights for failure to comply with it." *N.G.*, 2019 WL 2147263, at *6. On appeal, a court of appeals must consider whether the order, and the service plan if it was incorporated into the order, was sufficiently specific. *Id.*

A trial court order referenced by section 161.001(b)(1)(O) that establishes the actions necessary for the parent to obtain return of a child in the Department's custody is sufficiently specific when the terms for compliance are set forth with

certainty so that the parent knows what duties and obligations have been imposed. *Id.* at *5.

The mother contends on appeal that the evidence was insufficient to support the court's finding that she failed to comply with a court order because she "completed most of her services" "other than the positive drug tests for small amounts of drugs." The mother also argues that the Narcotics Anonymous or Alcoholics Anonymous meetings were not court ordered, not clearly incorporated into the service plan, and that she made a good faith effort to comply with the order.

We may not reverse a termination decree based on substantial compliance. *See In re A.D.N.*, No. 01-16-00785-CV, 2017 WL 491286, at *7 (Tex. App.—Houston [1st Dist.] Feb. 7, 2017, pet. denied) (mem. op.); *In re M.C.G.*, 329 S.W.3d 674, 675-76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). However, we will consider whether the order was sufficiently specific that the failure to comply warranted termination and whether the evidence supported the trial court's finding.

The family service plan was incorporated into a trial court order in January 2018. The plan as it existed in January 2018 required the mother to "remain drug free for the duration of the case," and to "maintain negative drug tests throughout

the life of the case." It also informed the mother that a failure to submit to a drug test would be considered a positive test. As to drug use and testing the plan stated:

> Random UA & Hair Follicle
> [The mother] will submit between the hours of 8:00 a.m. and 5:00 p.m. The agency will pay all fees for these services. In the event that [the mother] is a no call no show for 2 appointments then [the mother] will be responsible for the fees associated with those services. She will need to bring [her] identification to every test. If she fails to submit to a drug test it will be considered a Positive. She will be contacted by DFPS the morning she is to appear for testing. She must maintain negative drug tests throughout the life of the case.
>
> Drug & Alcohol Assessment.
> [The mother] must remain drug free for the duration of the case, and will be asked to participate in random urinalysis.

These requirements specifically informed the mother that when she received a phone call directing her to submit to random drug testing, she was required to appear during a specific time. By requiring the mother to maintain negative drug tests and to remain drug free, the order informed the mother that she was not to use any drugs during the "life of the case." The mother did not argue or ever assert that the order was insufficiently vague because it did not tell her where to go for drug testing, and the multiple times that she appeared and submitted to drug testing both before and after the two times when she failed to submit to drug testing support a conclusion that this was never an issue for this mother in this case. We conclude that the order was sufficiently specific to inform the mother of her obligation to submit to drug testing. *See N.G.*, 2019 WL 2147263, at *6.

39

The mother did not dispute that she failed to submit to drug testing on two occasions. And as we have discussed in our analysis of the endangerment predicates, the evidence supported a finding the mother used drugs during the pendency of the case.

As to housing, the plan stated:

Housing
[The mother] will maintain stable and appropriate housing for no less than 6 months. The home must be clean and free of hazards. She must provide proof of housing through a copy of a lease or other such documentation. She will allow caseworker access to [her] home during monthly visits and random pop-ups. If [the mother] moves from [her] residence she must provide an address to [her] caseworker by phone, mail or fax within 5 days of moving.

The order does not define stable and appropriate except to say that the mother was required to live in the same place for at least six months and that it should be clean and free of hazards. However, the requirements with which the mother failed to comply were sufficiently specific, i.e., providing the Department with a copy of a lease or other such documentation, and informing the caseworker within five days of any move. It is undisputed that the mother never provided the Department with a copy of a lease or any other documentation regarding housing.

As to Narcotics Anonymous and Alcoholics Anonymous meetings, the January 2018 plan provided:

Psychological Assessment

[The mother] will participate in a psychological evaluation within 45 days to determine [her] mental and emotional health status and needs. [The mother] will also participate in a psychiatric exam to determine any undiagnosed mental health issues. She will fully cooperate with the interviewer, and will provide complete, accurate and truthful answers. [The mother] will participate in any recommendations resulting from the evaluation, including attendance at [NA]/AA meetings, securing a sponsor, participating in substance abuse counseling, etc. She will furthermore follow all recommendations of the assessment, including family and/or individual counseling, further testing, other services and/or medication management, if applicable.

In April 2018, on the mother's request, the court modified the order stating that she could attend 12 Narcotics Anonymous or Alcholics Anonymous meetings "in lieu of 12 group therapy sessions," provided that after the completion of individual counseling, an individual therapy counselor would determine whether group therapy sessions were "still needed." The mother was present at the hearing when this order was entered. In *N.G.*, the Supreme Court noted that the trial court "is most involved in the termination proceedings and is in the best position to address the specificity of an order," including "easily" resolving "any concerns or confusion about the requirements a parent must satisfy to obtain return of a child under Department conservatorship." *See N.G.*, 2019 WL 2147263, at *6. The April 2018 modification of the order is an example of the trial court resolving concerns about the requirements the mother needed to satisfy to obtain return of her children. This order was sufficiently specific because it informed the mother that she was obligated to attend either 12 group therapy sessions or attend 12 meetings

of Narcotics Anonymous or Alcoholics Anonymous. The evidence at trial was that the mother did neither.

The mother also argued for the application of the affirmative defense found in section 161.001(d), which provides that a court may not "order termination under Subsection (b)(1)(O)" based on the parent's failure "to comply with a specific provision of a court order if the parent proves by a preponderance of evidence" that she "was unable to comply with specific provisions of the court order" and that she "made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent." TEX. FAM. CODE § 161.001(d).

The evidence demonstrated that the mother failed to comply the court's orders by failing to submit to drug testing, not remaining drug free during the life of the case, failing to provide documentation of housing, failing to inform the caseworker when she moved, and failing to attend either 12 group counseling sessions or 12 Narcotics Anonymous or Alcoholics Anonymous meetings. No evidence was presented to demonstrate that the mother was unable to comply or that her failure to comply was not her fault.

We conclude that the evidence was legally and factually sufficient to support the trial court's findings that the mother failed to comply with a court order under

section 161.001(b)(1)(O) and that the affirmative defense of subsection (d) did not apply. We overrule the mother's third and fourth issues.

## 2. The father failed to comply with his family service plan.

The trial court found that the father "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department" for at least nine months "as a result of the child's removal from the parent . . . for the abuse or neglect of the child." TEX. FAM. CODE § 161.001(b)(1)(O). Father's family service plan was "a court order that specifically established the actions necessary" for him to obtain the return of his children. *See id.* Substantial compliance with a court-ordered family service plan is not enough to avoid termination based on section 161.001(b)(1)(O). *A.D.N.*, 2017 WL 491286, at *7; *M.C.G.*, 329 S.W.3d at 675.

The father contends on appeal that the evidence was insufficient to support this finding, arguing that he did complete the requirements of the family service plan, "but not to the satisfaction of the Department." The family service plan required the father to "remain drug free for the duration of the case," and to "maintain negative drug tests throughout the life of the case." It also informed the father that a failure to submit to a drug test would be considered a positive test.

The father's family service plan differed slightly from the mother's family service plan. The father's family service plan did not specifically require him to submit to random hair follicle screening. Instead it provided:

Drug Screening

[The father] must remain drug free for the duration of the case, and will be asked to participate in random urinalysis. He will submit between the hours of 8:00 a.m. and 5:00 p.m. The agency will pay all fess for these services. In the event that [the father] is a no call no show for 2 appointments then [the father] will be responsible for the fees associated with those services. He will need to bring his identification to every test. If he fails to submit to a drug test it will be considered a Positive. He will be contacted by DFPS the morning he is to appear for testing. He must maintain negative drug tests throughout the life of the case.

These requirements specifically informed the father that when he received a phone call directing her to submit to random drug testing, he was required to appear during a specific time. By requiring the father to maintain negative drug tests and to remain drug free, the order informed him that he was not to use any drugs during the "life of the case." We conclude that the order was sufficiently specific to inform the father of her obligation to submit to drug testing. *See N.G.*, 2019 WL 2147263, at *6. It is undisputed that the father failed to submit to two court-ordered drug tests, resulting in two deemed positive results. And as we have discussed in our analysis of the endangerment predicates, the evidence supported a finding the father used drugs during the pendency of the case.

44

No evidence in the record supports a conclusion that the father was not able to comply with or not responsible for his failure to comply with the requirements to submit to drug testing and to remain drug free. In the absence of the required evidentiary showing, we conclude that the court did not err by finding that the affirmative defense of subsection (d) did not apply.

We conclude that the evidence was legally and factually sufficient to support a finding that the father failed to comply with a provision of a court order under section 161.001(b)(1)(O) and that the statutory affirmative defense did not apply. *See J.F.C.*, 96 S.W.3d at 266 (sufficiency standards of review). We overrule the father's second issue.

> **D.      The evidence is legally and factually sufficient to show that termination of the parents' rights is in the best interest of the children.**

Both parents challenged the sufficiency of the evidence to support the trial court's findings that termination of their right was in the children's best interests. We consider these challenges in light of the *Holley* factors.

> **1.      The evidence is legally and factually sufficient to support the trial court's finding that termination of the mother's rights was in the best interest of the children.**

*Desires of the children.* The mother argued that there was no evidence of the children's desires, that she visited the children regularly and without incident, and that she helped diffuse the tense situation at visitation. At trial, Moore, the

child advocate, testified that he regularly visited the children and the younger three children wanted their older siblings to come live with them. For this reason, and for the reasons discussed as pertinent to the father, this factor weighs in favor of the trial court's finding.

***Emotional and physical needs & emotional and physical danger to the children now and in the future.*** The mother argues that she provided proof of housing and employment, that she "learned from therapy and parenting on how to be a better parent." She also relies on the father's testimony that she is a good parent.

The evidence demonstrates that the mother continued to use illegal drugs while this case was pending, knowing that her parental rights were in jeopardy. This is particularly important considering the Department's earlier intervention with the family in 2015, which supports an inference that she understood the possible consequences of failure to comply with the court's orders. Both the caseworker and the child advocate were concerned about her unwillingness to acknowledge and address her drug problem. The mother did not complete the requirement to attend Narcotics Anonymous or Alcoholics Anonymous meetings or obtain a sponsor, which the child advocate's report noted was pertinent to relapse prevention.

For the same reasons that this factor weighed heavily in favor of the trial court's finding as to the father, this factor likewise weighs heavily in favor of the trial court's finding as to the mother.

***The parental abilities of the individuals seeking custody, and the programs available to assist these individuals to promote the best interest of the child.*** The mother makes no arguments about these factors, but we note that the mother testified that she had learned better communication skills through the court-ordered parenting classes.

***The plans for the child by these individuals or by the agency seeking custody.*** The mother argued that the Department's plan for the children was "lackluster," because the children were placed in separate foster homes, one of which did not wish to adopt and the other which was not yet qualified to foster all of the children. The evidence showed that the Department worked to keep the children together and to evaluate the relative placements proposed by the parents. Although the proposed relatives were ultimately not approved by home study, the Department identified a foster family that is willing and able to keep the five siblings together. This weighs in favor of the trial court's finding.

***The stability of the home or proposed placement.*** The mother did not address this factor. However, both Boatner, the caseworker, and Moore, the child advocate, agreed that the current foster placements were meeting the needs of the

children and that the potential adoptive parents had the ability to provide a home for all five children.

***The acts or omissions of the parent that may indicate the existing parent-child relationship is not proper, and any excuse for the acts or omissions of the parent.*** The mother did not address this factor. However, in our analysis of the sufficiency of the evidence to support the predicate-act finding, we addressed the mother's continued use of drugs during the life of this case. We have also explained how drug use creates a risk of instability in the lives of children.

* * *

Having considered the relevant *Holley* factors, we conclude that the evidence is both legally and factually sufficient to support the trial court's finding that termination of the mother's parental rights is in the best interest of the children. We overrule the mother's fifth issue.

> **2.    The evidence is legally and factually sufficient to support the court's finding that termination of the father's rights is in the best interest of the children.**

***Desires of the children.*** At the time of trial, the children ranged in age from one to six years old. The father argued that because there was no indication of the children's desires, we should presume the children are bonded to their father. Therefore, he argues that this factor weighs heavily against termination.

"When a child is too young to express his desires, the factfinder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent." *A.H.L.*, 2017 WL 1149222, at \*5. The caseworker, the Child Advocate, and the foster mother all provided testimony probative of the fact that the younger three children were bonded with the foster family. In addition, the foster mother testified that she had gotten to know the twins by hosting them in her home for visits with their siblings. Moore, the Child Advocate, testified that he had visited the younger three children and they wished to have their older siblings join them in their foster home.

In addition, the parents attended visitation with the children until early May 2018, when they were discontinued with the provision that they could be restarted upon the parents' negative drug tests. The visits were not restarted during the life of this case. Trial was held on October 30, 2018. For nearly half his life, Ben had no contact with his parents. And due to their young ages, the bond with the foster parents is a significant factor favoring the trial court's determination.

***Emotional and physical needs & emotional and physical danger to the children now and in the future.*** As to these factors, the father conceded that the children's needs were met and that they were safe, stable, and protected in their foster placements. However, he speculated that the situation could change in the future.

49

"The stability of the home has been found 'to be of paramount importance in a child's emotional and physical well-being.'" *A.H.L.*, 2017 WL 1149222, at *5 (quoting *Quiroz v. Dep't of Family & Protective Servs.*, No. 01–08–00548–CV, 2009 WL 961935, at *10 (Tex. App.–Houston [1st Dist.] Apr. 9, 2009, no pet.) (mem. op.)). "A parent's drug use may indicate instability in the home because it exposes the children to the possibility that the parent may be impaired or imprisoned." *Id.* (citing *A.M.*, 495 S.W.3d at 579). Likewise, a parent's criminal history is indicative of a pattern of conduct that creates a risk of uncertainty and instability in the child's life. *Id.*

The evidence demonstrates that the father continued to use illegal drugs while this case was pending, knowing that his parental rights were in jeopardy. This is particularly important considering the Department's earlier intervention with the family in 2015, which supports an inference that he understood the possible consequences of failure to comply with the court's orders. Both the caseworker and the child advocate were were concerned about his inability to remain drug free. The father did not complete the requirement to attend Narcotics Anonymous or Alcoholics Anonymous meetings or obtain a sponsor, which the Child Advocate's report noted was pertinent to relapse prevention.

The father admitted that he had prior convictions for possession of marijuana and controlled substances. In 2007, he pleaded guilty to possession of marijuana;

50

he spent five days in jail and his driver's license was suspended for a year. In 2008, he again pleaded guilty to possession of marijuana, twice, and he spent more than two weeks in jail. His driver's license was suspended for a year. In 2014, he was convicted of possession of marijuana and sentenced to ten days in county jail. His driver's license was suspended for six months. In 2014, he was convicted of possession of marijuana and sentenced to ten days in jail. In July 2018, he was arrested for theft and possession of a controlled substance. The father testified that the charges would be dismissed.

Moore's report was admitted at trial. In it, he repeatedly noted the children's need for predictability, routine, and stability in their lives. For the twins, he noted it was necessary to help them achieve educational and developmental goals; for Noah, he noted it was necessary due to his age and attention deficit issues; for Ben, he noted it was necessary due to his age and lingering effects of his premature birth.

Considering the children's emotional and physical needs and the risk of instability evidenced by the father's history of drug use, including during the pendency of this case, as well as his criminal history, these factors weigh heavily in favor of the trial court's finding.

***The parental abilities of the individuals seeking custody, and the programs available to assist these individuals to promote the best interest of the child.*** As to

these factors, the father argues that he wants all of his children returned to him and that he has completed his family service plan. We have already explained our conclusion that the father did not fully comply with the family service plan because he did not remain drug free. His desire to reunify with his children is understandable, but it is not evidence of his parental ability. The record demonstrates that the foster mother seeking custody of the all children is a trained educator, and that she has enlisted professional support to assist with caring for her biological and foster children.

*The plans for the child by these individuals or by the agency seeking custody.* The father concedes in his brief that he has no plan for the children at this time. The foster parents of the younger three children want to adopt all five siblings. They have been actively seeking approval to adopt them all and arranging for additional child care support. The foster mother testified that she wants to raise them, ensure they are educated, and help them go to college. This factor weighs in favor of the trial court's finding.

*The stability of the home or proposed placement.* The father concedes that the children's foster placements are safe, stable, and protective for the children.

*The acts or omissions of the parent that may indicate the existing parent-child relationship is not proper, and any excuse for the acts or omissions of the parent.* The father argues that he has completed his family service plan and that he

does not use illegal drugs. He further argues that he used a combination of prescription drugs that may have led to the positive drug tests. We have addressed these arguments in our analysis of the predicate act finding. We have also explained why drug use creates a risk of instability in the lives of children.

* * *

Having considered the relevant *Holley* factors, we conclude that the evidence is both legally and factually sufficient to support the trial court's finding that termination of the father's parental rights is in the best interest of the children. We overrule the father's third issue.

## II.    The mother has not shown that the court abused its discretion by proceeding with a bench trial.

In her sixth issue, the mother questions whether the trial court erred by denying her request for a jury trial. Although the Texas Constitution provides that the right to a trial by jury "shall remain inviolate," in civil cases, a party must file a written request and pay a jury fee not less than 30 days before the date set for trial of the cause on the nonjury docket. *See* TEX. CONST. art. I, § 15; TEX. R. CIV. P. 216; *In re H.C.C.*, No. 01-16-00876-CV, 2017 WL 6520228, at *4 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by denying request for a jury trial that was filed 16 days before the trial setting). The mother filed a jury demand and paid the fee on

53

October 1, 2018, which was 29 days before the date set for trial of the case on the nonjury docket.

On appeal, she asks this court to review the denial of her request for a jury stating that it was made within hours of the 30-day deadline. Her brief does not include any legal argument or citation to the record. *See* TEX. R. APP. P. 38.1(i). She makes no specific arguments in connection with this issue, and we are unable to determine why the mother contends that, in the specific circumstances of this case, the denial of the request for a jury was an abuse of the court's discretion.[6] The brief does not explain how the trial court's action probably caused the rendition of improper judgment or probably prevented the mother from properly presenting the case to the court of appeals. *See* TEX. R. APP. P. 44.1.

We overrule the mother's sixth issue.

---

[6] A trial court does not abuse its discretion by denying a request for a jury trial in a termination of parental rights case when the request was filed late, the party seeking the jury trial failed to request a continuance, and the requesting party made no effort to carry her burden of showing that a jury trial could be held without (1) interfering with the court's docket, (2) delaying the trial, or (3) injuring the opposing party. *See Monroe v. Alternatives in Motion*, 234 S.W.3d 56, 69–70 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Barkhausen v. Craycom, Inc.*, 178 S.W.3d 413, 417–18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

## Conclusion

We affirm the trial court's decree.

Peter Kelly
Justice

Panel consists of Justices Keyes, Kelly, and Goodman.

Justice Goodman, dissenting.